CITY OF ST. LOUIS, Plaintiff in Error, v. NICH-
OLAS NASH.

Division Two, January 6, 1916.

1. **FIRE LIMITS:** Definition of Structures. Within properly
defined limits a municipal legislative body may define the ob-
jects designed to be affected by its fire-limit ordinances and a
court in construing such ordinances is ordinarily bound to fol-
low the city's definitions of buildings and other structures so
affected.

2. ————: **Tent: Lacking Portability: Building.** A structure lack-
ing the element of portability, and being canvas stretched and
held in place by a wire cable attached to two large telegraph
poles set firmly in the ground and by guy cables run laterally
from this main cable to other posts also set firmly in the ground,
with a stage, dressing rooms, ticket office and benches built
of wood, the whole used as a moving-picture theatre, is not a
tent, as that word is ordinarily understood; but under the
ordinances of St. Louis declaring that the word "building"
shall be taken to mean "any structure for the support, shelter
or enclosure of persons, animals or chattels" is a building within
the purpose and intent of the fire-limit restrictions.

3. ————: **Reasonable Regulation.** And an ordinance which
prevents the carrying on of a permanent business in such a
building is a reasonable police regulation.

Error to St. Louis City Court of Criminal Correction.
—*Hon. Benjamin F. Clark*, Judge.

REVERSED AND REMANDED (*with directions*).

*William E. Baird* and *Truman P. Young* for
plaintiff in error.

The structure erected by the defendant is a build-
ing within the definition of the Building Code of the
city of St. Louis and within the general legal interpre-
tation placed upon the word "building." Revised
Code of St. Louis, sec. 336; Blakemore v. Stanley, 33
N. E. 689; Nowell v. Boston Academy, 130 Mass. 209;

Killman v. State, 28 Am. Rep. 432; Favre v. State, 73 Am. St. 953; Williams v. State, 70 Am. St. 82; Kansas v. Poole, 65 Kan. 713; People v. Steckman, 34 Cal. 242.

*Taylor R. Young* and *Edward W. Forristel* for defendant in error.

(1) Sections 341 and 505, R. O. City of St. Louis 1912, were never intended to prevent the erection and maintenance of a tent, such as the evidence in this case shows the defendant was erecting at the time he was charged with violating said sections. Childress Seashore v. Atlantic City, 59 L. R. A. (N. J.) 947; Coddington v. Beebe, 31 N. J. L. 477; Allen v. Ayre, 3 Dow & R. 96; Trust Co. v. Cameron I. & C. Co., 47 Fed. 136; Callahan v. State, 41 Tex. 43; State v. Barr, 39 Conn. 44; Rouse v. Catskill, 13 N. Y. Supp. 123-127; Tuesdell v. Gray, 79 Mass. 311; Hawaii v. Manchiki, 190 U. S. 197; Century Dictionary, pp. 712, 6234; Bouvier's Law Dictionary, p. 268; 1 Oxford's Dictionary, p. 1162; Anderson's Law Dictionary, p. 139; 6 Cyc. 115 (2) Even though said sections were intended to apply, they are so unreasonable as to be void under the decisions of this court. Kelley v. Meeks, 87 Mo. 396; Corrigan v. Gage, 68 Mo. 541; St. Louis v. Weber, 44 Mo. 547; Tarkio v. Cook, 120 Mo. 1. (3) The Municipal Assembly of the city of St. Louis, has no power to prevent by ordinance the use of property so as to prevent a tent of the character in question here from being constructed upon and operated in connection with the use of such property. Clause 12, sec. 26, art. 3, Charter, City of St. Louis.

FARIS, P. J.—This is a case growing out of the prosecution of defendant in error for an alleged violation of an ordinance of the city of St. Louis. Being cast in the police court and likewise in the Court of Criminal Correction to which it appealed, the city

brings the case here by writ of error. Since, through-out, no change has occurred in the parties, we will for clarity's sake refer to them as the plaintiff and the defendant, respectively.

The section of the city ordinances which the complaint alleges that defendant violated, reads thus:

"Sec. 341. No fourth-class buildings shall here-after be built within the district known as the fire limits, as hereafter defined, except such buildings as are provided for in sections 342 and 343 of this article." (Here follows a description of the fire limits.)

When the case reached the Court of Criminal Correction a motion to quash the complaint was filed by defendant, but action thereon was deferred by the learned judge *nisi* till he had heard the case on the merits. Thereupon the case was presented below upon agreed facts, which the court heard and there-after entered an order quashing the complaint. There-fore, though we follow the language of the court *nisi* in stating that the motion to quash was sustained, it is plain that the case was actually heard and decided on the merits.

The agreed facts are lengthy; but since in the view we take of the controversy, alone, the method of the construction and physical nature of the struc-ture erected and used by defendant is important, we will not burden the statement of the case with more of the facts than will but suffice to illuminate this single point. Specifically, defendant was prosecuted for erecting and using as a moving-picture theatre, a certain structure which plaintiff contends violated the provisions of the section of the city ordinances which we quote above. The erection and use of the structure within the fire-limits were admitted. It is therefore manifest that the whole case turns on the nature of the structure so erected by defendant. The agreed facts

thus describe the materials of which it was constructed, the manner of construction thereof and the purposes for which it was used, viz.:

"Said shelter or structure is ninety-seven feet in length and fifty-eight feet in width, and has a height along the center of thirty feet, and a height along the sides, between the ground and the eaves, of eight feet. It is supported by two telegraph poles fourteen inches in diameter firmly set in the ground, one at the front end, facing Jefferson Avenue, on the inside, about ten feet west of the entrance, and in the center thereof. The other on the outside and west of the west end thereof. Said telegraph poles are thirty-five feet high, and between them is stretched a wire cable an inch and a half or two inches in diameter. To said cable are attached ropes which extend down to the top of the canvas cover and support the same. Also at intervals of eight feet, ropes extend down from the center of the top of the cover of said shelter or structure to the sides and bottom thereof, and most of them are connected with wooden posts securely driven in the ground and which are located about ten feet outside of the canvas cover, which keeps the covering taut. There are thirty of said poles upon each side of said shelter or structure, one-half of which are eight feet in height and the remainder twelve feet in height. Said poles are about three and one-half inches in diameter, and in the center of the top thereof is an iron peg securely driven therein, about one-half inch in diameter and eight inches in length and which projects above the top of the said pole about five inches. The canvas covering is composed of 12-ounce Army Duck Canvas. At the front end of said shelter or structure two wire cables or guy cables extend from the top of the front telegraph pole, one to the northeast corner of the lot upon which said shelter stands, and the other to the southeast corner. Said cables are attached to

posts firmly embedded in the ground fifteen feet out-
side of said shelter. At the rear end of said structure
or shelter are three guy cables which extend from the
top of the telegraph pole at the rear of said structure
to posts firmly embedded in the ground, one of them
at the northwest corner of the lot upon which said
shelter or structure is located, another at the south-
west corner and another at the west and near the cen-
ter of the west end of said lot. The front and rear
ends of said shelter or structure are supported by two
poles, eighteen feet high, at each end thereof, which
support the canvas cover at a point fifteen feet from
the top of the cover on each side and at the end thereof.
At the rear end of said shelter or structure is located
a stage or platform, built of wood, upon each side of
which are wings or dressing rooms composed partly of
wood and partly of canvas. Inside of said structure
or shelter are rows or tiers of seats in bench form.
Between said rows of seats there is one aisle down the
center six feet wide, and on each side of said shelter
or structure there is also an aisle eight feet wide.
There are sixty-four benches, each of which will seat
ten people, so that said shelter or structure has a seat-
ing capacity of six hundred and forty persons. The
said shelter or structure is equipped with electric
lights set in iron conduit for lighting in the evening,
and the stage or platform is also equipped with elec-
tric footlights set in conduit. Said shelter or structure
is constructed in such a way that the sides can be
raised up in the summer time and lowered in the win-
ter time, and in the winter time the said sides are low-
ered, and at all places, except exits, when the sides
are lowered, are banked along the outside with earth
sufficient to shut out drafts. Said shelter or structure
is equipped with four so-called cannon, or heavy cylin-
drical, stoves for heating, one stove being placed in
each corner thereof, and the stovepipe goes out

through a hole in the side, which is fortified with asbestos and tin, and projects ten feet outside of the canvas cover. The floor of said structure or shelter is of earth and cinders, except that in front of each seat there is a board plank eight inches wide upon which the audience rest their feet. And in each aisle there is a board walk eight feet wide composed of one by two boards laid flat on the ground and nailed to cross pieces sunk in the ground. And between the ticket office and the east side of said shelter or structure are also similar boards laid in like manner. The seats are built of wood, in the form of benches. Along the street line or entrance to the lot upon which said shelter or structure stands is a series of door panels, composed of wood and glass, and consisting of eight such door panels. Six of said panels swing on hinges, and may be opened for the admission or exit of persons. Immediately inside of said outside entrance is an open space of ten feet where there exist two brick columns with wood jambs upon which two swinging doors are hung, composed of wood with glass windows, about seven feet in width and eight feet high. Between the two entrances there is a booth made of wood seven feet high and in the shape of a half moon, and is located outside of the shelter or structure. After passing through said inside entrance doors the audience are admitted into a small corridor or chamber, with a canvas cover, with canvas sides, which leads through a canvas curtain directly into the main auditorium. In the summer time these doors and the corridor are done away with, and the audience simply pass from the ticket office into the main auditorium. There they are seated for the purpose of witnessing exhibitions of moving pictures, etc. One exhibition is held every evening, and further, there is an exhibition every Sunday afternoon. Such, in general, is the description of the structure or shelter in question.''

It is clear that if the erection and use of the structure above-described violate the provisions of section 341 of the ordinances, the court *nisi* erred; if it does not, he was right. Let us look to this point.

I. Confining the case to yet narrower limits, it is obvious that the question turns on whether the described structure is or is not a "building" within the purview of the section of the fire limits ordinance set forth, supra, and which plaintiff alleges defendant violated. If it is a building it is conceded to be such a one as is by the city ordinances designated, "of the fourth-class," the erection of which, at the place where defendant built and maintained the structure in controversy, is absolutely forbidden by said section 341. Plaintiff urges that the structure is a building; defendant just as strenuously contends that it is a tent. This, in a nutshell, is the concrete point confronting us.

*Tent: Definition.*

The city ordinances define buildings of the several classes thus:

" 'Building of the First Class' shall be taken to mean a building of fire-proof construction throughout, the structural parts of which are wholly of brick, stone, or tile, concrete, iron or steel, or other equally substantial and incombustible materials. 'Building of the Second Class' shall be taken to mean a building of mill or slow combustion construction, wherein all floors and roofs are constructed of heavy dressed timber, exposed beams, girders and planking and supported upon masonry walls, or on wooden or fireproofed iron or steel columns. 'Building of the Third Class' shall be taken to mean any building not of the first or second class, the external and party or division walls of which are wholly of brick, stone or other equally substantial and incombustible materials. 'Building of the Fourth Class' shall be taken to mean

266Mo.34

any building not of the first, second or third classes.''
[Sec. 336, R. C. St. Louis.]

There is but little doubt we opine that within
limits not necessary here to discuss (since obviously
the boundaries are wide enough to include the facts
here), a legislative body may define the objects af-
fected or designed so to be by its own enactments, and
that we are bound ordinarily in construing its acts or
ordinances to follow its own definitions. [State ex
rel. v. Allison, 155 Mo. 325.] Therefore we note that
a ''building'' is thus defined by the ordinances of
plaintiff city:

'' 'Building' shall be taken to mean any structure
for the support, shelter, or enclosure of persons, ani-
mals or chattels; and when separated by division
walls without openings, then each portion of such
building shall be deemed a separate building.'' [Sec.
336, R. C. St. Louis.]

So again narrowing the limits of the question and
the scope of the instant inquiry, we need only to ascer-
tain whether the structure in question was a building
within the purview of the above definition.

Defendant strenuously insists that the structure
in controversy is a tent, and that a tent is not a build-
ing. *Quod erat demonstrandum.* We may question
this position from two angles: (a) Can it be main-
tained upon the facts, and (b) if it can be so main-
tained will the legislative definition nevertheless in-
clude it and make of it a building when, absent the
definition, it was before but a tent?

The lexicons, under the statutory admonition
that words found in statutes are to be regarded or-
dinarily as being used in their plain, usual and every-
day meaning (Sec. 8057, R. S. 1909), define the
word ''tent'' thus: ''A pavilion, or portable lodge
consisting of skins, canvas or some strong cloth
stretched and sustained by poles, used for sheltering

persons from the weather, epecially soldiers in camp."
[Webster's Int. Dic.]

The above definition of the lexicographers, is in
line with that of the courts, as witness the Texas
Court of Criminal Appeals which defines a tent thus:
"A 'tent,' in the ordinary acceptation of the word, is
a pavilion, portable lodge, or canvas house, inclosed
with walls of cloth and covered with the same mate-
rial." [Killman v. State, 2 Tex. App. 222.] Likewise
pertinent to the question whether a tent is a house,
and therefore a building, the curious may consult the
cases of Nowell v. Boston Academy, 130 Mass. 209;
Blakemore v. Stanley, 159 Mass. 6; Favro v. State, 73
Am. St. 950; Williams v. State, 70 Am. St. 82; State
v. Poole, 65 Kan. 713; People v. Stickman, 34 Cal.
242.

Analyzing the facts of construction in the light
of the definitions, supra, but leaving out of view the
dimensions of this structure, which are ninety-seven
by fifty-eight by thirty feet, we observe that it seems
to lack portability, in that it is supported by tele-
graph poles fourteen inches in diameter "set firmly
in the ground." These telegraph poles are bound to-
gether by a two-inch wire cable, which serves as, and
in lieu of, a ridge-pole. From these telegraph poles
other wire cables, five in all, called guy-cables, run
down to an attachment to other posts "firmly em-
bedded in the ground." Likewise a departure touch-
ing the sort of materials used in construction is noted.
For at the rear of the structure there is "*a stage built
of wood, upon each side of which are wings or dress-
ing rooms composed partly of wood and partly of*
canvas." This stage and the whole structure for that
matter, is equipped with electric lights, and at the
front of the stage there are footlights set in a con-
duit. Practically the whole of the floor, in fact all
space, except that on which the seats sit, is covered

St. Louis v. Nash.

with boards. Such floor is constructed for the most part of one by two boards laid flat and nailed to cross-pieces sunk in the ground. The front of the structure which abuts on the street, is made of eight door panels, which swing on hinges and which are made of wood and glass. Just inside of the outside entrance there are two brick columns with jambs of wood, to which are hung doors of wood and glass, seven feet wide and eight feet high. Between the row of eight wood panels and the row made up of the brick columns and swinging doors *there is a crescent shaped booth made of wood,* which apparently serves as a place for selling tickets. But this should suffice for an iteration of points of dissimilarity between this structure and a tent. The others may be picked out of the description which we print in our statement. It will be seen that the element of portability is sadly lacking, and that other materials, to-wit, wood and glass and brick, have been added to the skin and canvas-covering of the genus tent, connoted by the definitions of the cases and of the lexicographers. Clearly this structure cannot be made a tent merely by calling it a tent, even though touching a matter to an extent analogous, one Squeers of Dotheboys Hall sapiently observed that "there is no law to prevent a man from calling his house a hall if he wants to do so." [Nicholas Nickleby, reported by Charles Dickens.]

So, examined by the touchstone of similarity of earmarks, we must conclude that the structure in controversy is not a tent, as the latter *word is generally understood.* In passing we may say that the word 'tent" as used in our statutes, numerously cited to us by defendant, means "tent" as the word is ordinarily understood, and therefore the language of those statutes is in no way pertinent to contradict what we say above.

II. We turn to the definition then to determine if we can, whether within the purview of the ordinances of the plaintiff city, it is a building. We need consider only the first part of the definition, to-wit: " 'Building' shall be taken to mean any structure for the support, shelter, or enclosure of persons, animals, or chattels," and leave off the last, to-wit: "and when separated by division walls without openings, then each portion of such building shall be deemed a separate building;" for obviously if we conclude that it is a building we are not called on to proceed further and rule that it is two buildings, even though the facts that there is a wooden stage at one end and a wood and glass ticket office and entrance at .the other, seem pertinent to this view.

*A Building.*

Looking at the legislative definition and measuring the structure here thereby, there is no escape from the conclusion that it is a building *within the purpose and intent of the fire-limits ordinance,* and so we rule.

III. Neither do we think that the ordinance is void for that it is unreasonable. Defendant urges this, saying, if we understand his contentions, which are somewhat vague, that should we hold that the ordinance includes a structure of the sort here in question, then such a construction renders the ordinance void because it is unreasonable and unduly burdensome. Such ordinances are referable to the police power, through an invocation of which alone are they sustainable. We are not advised wherein the alleged unreasonableness lies; neither do the cases cited by defendant throw any light upon the point. Speaking generally we may say that if such structures as that here under discussion are not to be regulated and their erection either forbidden, or at least controlled, by ordinance, there seems to be nothing in this case at least which would prevent the construction of inflammable and

*Reasonable Fire Limitation.*

unsightly conglomerate sheds of the same sort any-
where and everywhere in the city, and the carrying on
therein of permanent businesses of whatever sort in-
definitely., Such a condition is unthinkable. We need
not take up space considering this phase of the case,
but disallow it out of hand.

Let the case be reversed and remanded, with di-
rections to the court *nisi* to overrule the motion to
quash the complaint and to retry the case in such wise
as is not inconsistent with the views herein expressed.
All concur.