## ARGUED AND DETERMINED

IN THE

# SUPREME JUDICIAL COURT

OF

# MASSACHUSETTS.

---

WILLIAM P. HARVEY & others *vs.* Z. TAYLOR MERRILL
& another.

Suffolk.   March 5, 1889. — September 5, 1889.

Present: MORTON, C. J., FIELD, W. ALLEN, C. ALLEN, & HOLMES, JJ.

*Sale on Margin — Wagering Contract — Public Policy — Broker —
Law of another State.*

Where the rights of parties to an action are governed by the common law of
another State, in the absence of evidence of such law decision will be made
according to the law of this Commonwealth.

A wagering contract is illegal and void, as against public policy, and a broker who
knowingly makes such a contract and advances money on account thereof, at
the request of his principal, cannot recover either the money so advanced or
commissions for his services.

Brokers in Chicago made a contract with a firm in Boston, in consideration of
orders from the latter to buy and sell pork for future delivery, to make such
purchases and sales of equal amounts thereof in their own names on the Chicago
Board of Trade, and to procure them to be set off against each other according
to the usages of that board; that the firm should only be required to pay to
them, or be entitled to receive, the difference between what the pork cost and
what it was sold for; and that the firm should put up certain margins and pay
the brokers their commissions.   The firm gave the orders and furnished the
margins, and the brokers made the purchases and sales, and set them off against
each other at a loss.   *Held*, that the contract was a wagering contract, and that
the brokers could recover neither their commissions nor the losses incurred by
them in settling such differences, although the sales and purchases made by
them might be valid.

. VOL. 150.                              1

CONTRACT to recover for losses incurred by the plaintiffs, in the purchase and sale of pork on the Chicago Board of Trade for the defendants, and for their commissions as brokers. The case was referred to an auditor, who made a report, which, so far as material, is as follows.

The plaintiffs were commission merchants and brokers, dealing in provisions and grain as members of the board of trade in the city of Chicago. The defendants were brokers in the city of Boston, who forwarded orders for the purchase and sale of pork, upon contracts for future delivery, to the plaintiffs, who entered into contracts of purchase and sale for future delivery in their own name, but for account of the defendants, the defendants promising to pay them a commission for the execution of such orders, and to reimburse them for any expenses or losses which should be incurred in the final settlement. This action is brought to recover for commissions in the execution of such orders, and for the loss, being the difference between the contracts of purchase which the plaintiffs made on behalf of the defendants and the sales of the same quantity of pork for the same account.

The defendants gave the orders, and the plaintiffs made the contracts. There was a rapid decline in the market shortly after the contracts for purchases were made, in consequence of which, when the contracts for sales were made, there was a loss of about twenty thousand dollars, which the plaintiffs have paid and have suffered.

It was the custom in such dealings for persons in the situation of the plaintiffs to require a deposit of a margin, unless the person executing the orders was content to rely upon the pecuniary responsibility of the person giving such orders, and there was a customary margin of a dollar a barrel on pork at that time in these transactions made on the Chicago Board of Trade. A draft of one thousand dollars was sent on May 28, 1883, and credited as a margin, and another sum of three thousand dollars as a margin was sent by the defendants about July 2, in response to a request from the plaintiffs for the same.

The principal ground of defence was that these contracts were made upon the mutual understanding that no delivery of the merchandise was intended or expected, but that, by a series

of offsetting contracts of sales for future delivery of the same kind of merchandise, settlements were to be made by the payment of the difference in price, according to the state of the market as it should rise or fall, and that the contracts were merely a device to enable the parties to make, in effect, wagers upon the probable rise or fall in the market, and thus to gamble upon the chance of such advance or decline in prices.

It was well understood by the parties, both plaintiffs and defendants, that, though the contracts in form called for and required an express delivery of the pork purchased and sold, yet the parties intended and contemplated only transactions by formal contracts, which should be set off one against the other, to avoid the necessity of ever receiving or delivering a single barrel of pork, and that the transactions were to be adjusted and settled solely upon those differences which the chances of the rise and fall of the market should create. These contracts were to be executed in Chicago, and were clearly governed by the law of Illinois ; and, at the time they were made, a statute was there in force which declared that " whoever contracts to have or give to himself or another the option to sell or buy at a future time any grain or other commodity, stock· of any railroad or other company, . . . shall be fined not less than $10 nor more than $1,000, or confined in the county jail not exceeding one year, or both; and all contracts made in violation of this section shall be considered gambling contracts, and shall be void." Rev. Sts. of Ill. of 1874, c. 38, §'130.

The terms of these contracts did not give the parties an option to sell or buy at a future time this pork ; they were contracts to be fulfilled by the delivery of the pork in a future month; and were not such options as are forbidden by the statute. The auditor based his finding as to the invalidity of the contracts upon the fact, that, though the parties made express contracts for the purchase of several thousand barrels of pork in June and July, to be delivered in August and September, yet it was well understood between the parties that actual deliveries were not to be made, but such deliveries were to be avoided by the device of making equivalent contracts for the sale of an equal number of barrels of pork deliverable in the same months, and then by making a direct settlement by a set-off of these opposite con-

tracts, and by paying or receiving the difference created by the rise or fall in the market prices. According to the rules of the board of trade, and according to the terms of the contracts made, the purchaser could exact the delivery of the article, and he could not be required to settle by an offsetting contract; and a seller could likewise insist upon a delivery and payment of the money, and not be required to settle by an offsetting contract. In a vast majority of the transactions of the board of trade, settlement was made by the set-off of opposite contracts; and in every instance such was the mode of dealing between the plaintiffs and the defendants.

The defendants did not deal in these articles of merchandise by the actual receipt and delivery of the same, and never have done so. They had no facilities to handle them by actual receipt and delivery; they had no warehouses; the customers for whom they acted appeared to be residents of Lawrence in this Commonwealth, and there was no disclosure of any circumstance indicating any facilities on the part of these customers for the receipt, storage, or delivery of such a quantity of these commodities as the defendants ordered to be bought and sold. In a period of two months the defendants ordered purchases of above fifteen thousand barrels of pork, at an aggregate cost of about two hundred and fifty thousand dollars; they also bought large quantities of lard, wheat, corn, and ribs; and the aggregate of the purchases was between four and five hundred thousand dollars, and they were nearly all made within the thirty days following June 11, 1883. In the same period they sold the same quantity of pork, lard, wheat, corn, and ribs as was purchased, with a net loss of between twenty and twenty-five thousand dollars. No warehouse receipt, no bill of lading, and no item of storage, appears to have been created in any of these transactions.

The plaintiffs rendered to the defendants an account covering all their transactions, which exhibited a balance due from the defendants to the plaintiffs.

The auditor found for the defendants, solely on the ground that, under the guise of the contracts above described, the real intent was to speculate on the rise and fall of prices, and not to receive or deliver the actual commodities, and therefore that the

contracts were wagers; but if his finding in this respect should be incorrect, he found that the plaintiffs were entitled to recover such balance with interest.

The auditor filed a supplemental report, which contained the following statement:

" The contracts made between members of the board of trade appear, upon the evidence before me, to be valid obligations, some of which, it appears, are executed by actual deliveries; and there was no evidence before me that any ear-mark or distinctive feature of any of the contracts so made existed, by which the majority that were to be set off and cancelled without delivery of merchandise could be distinguished from the minority, in which actual delivery was made. . . . My finding relates to the understanding between the plaintiffs and the defendants, and my conclusion is unchanged that the parties to this suit entered into the dealings with each other, which are the subject thereof, with a clear understanding that actual deliveries were not contemplated, and were not to be enforced; and it appears to me that the question whether the members of this board with whom the defendants dealt had such an understanding with each other is not material to the issue of this case. If it is material, I do not find such an understanding to have been proved."

At the trial in this court, the reports of the auditor were the only evidence introduced by either party, and *Holmes,* J. declined to submit the case to the jury, or to direct a verdict for the defendants, as requested by them; but instructed the jury that the plaintiffs were entitled to a verdict upon the auditor's report.

The jury returned a verdict for the plaintiffs; and the defendants alleged exceptions.

*R. M. Morse, Jr. & W. S. Knox,* for the defendants.

*E. W. Hutchins & H. Wheeler,* for the plaintiffs.

FIELD, J. The rights of the parties are to be determined by the law of Illinois, but there is no evidence that the common law of Illinois differs from that of Massachusetts. We cannot take notice of the statutes of Illinois, except so far as they are set out in the auditor's report; and the auditor has set out but one· statutory provision of that State, and has found that the

parties have not acted in violation of that. We are therefore to determine whether the contract between the parties, as the auditor has found it to be, is illegal and void by the common law of Massachusetts.

It is not denied that, if, in a formal contract for the purchase and sale of merchandise to be delivered in the future at a fixed price, it is actually the agreement of the parties that the merchandise shall not be delivered and the price paid, but that, when the stipulated time for performance arrives, a settlement shall be made by a payment in money of the difference between the contract price and the market price of the merchandise at that time, this agreement makes the contract a wagering contract. If, however, it is agreed by the parties that the contract shall be performed according to its terms, if either party requires it, and that either party shall have a right to require it, the contract does not become a wagering contract, because one or both of the parties intend, when the time for performance arrives, not to require performance, but to substitute therefor a settlement by the payment of the difference between the contract price and the market price at that time. Such an intention is immaterial, except so far as it is made a part of the contract, although it need not be made expressly a part of the contract. To constitute a wagering contract, it is sufficient, whatever may be the form of the contract, that both parties understand and intend that one party shall not be bound to deliver the merchandise and the other to receive it and to pay the price, but that a settlement shall be made by the payment of the difference in prices.

The construction which we think should be given to the auditor's report is, that he finds that the contracts which the plaintiffs made on the board of trade with other members of that board were not shown to be wagering contracts, and that the contract which the defendants made with the plaintiffs was, that the defendants should give orders from time to time to the plaintiffs for the purchase and the sale on account of the defendants of equal amounts of pork to be delivered in the future; that the plaintiffs should, in their own names, make these purchases and these sales on the board of trade; that the plaintiffs should, at or before the time of delivery, procure these

contracts to be set off against each other, according to the usages of that board; that the defendants should not be required to receive any pork and pay for it, or to deliver any pork and receive the pay for it, but should only be required to pay to the plaintiffs, and should only be entitled to receive from them, the differences between the amounts of money which the pork was bought for and was sold for; and that the defendants should furnish a certain margin, and should pay the plaintiffs their commissions.

The defendants gave orders in pursuance of this contract, the plaintiffs made the purchases and sales on the board of trade, set them off against each other, and now sue the defendants for the differences which they have paid and for their commissions.

The auditor has found, that, "in a vast majority of the transactions of the board of trade, settlement was made by the set-off of opposite contracts." In his supplemental report he says, "My conclusion is unchanged, that the parties to this suit entered into the dealings with each other which are the subject thereof with a clear understanding that actual deliveries were not contemplated and were not to be enforced; and it appears to me that the question whether the members of this board with whom the defendants dealt had such an understanding with each other is not material to the issue of this case."

The peculiarity of this case, according to the findings of the auditor, is, that while the contracts which the plaintiffs made on the board of trade must be taken to be legal, the plaintiffs have undertaken to agree with the defendants that these contracts should not be enforced by or against them, except by settlements according to differences in prices. If such an agreement seems improbable, it is enough to say that the auditor has found that it was made. The usages of the board of trade were such that the plaintiffs might well think that they risked little or nothing in making such an agreement. Indeed, the distinction in practice between the majority of contracts which by the auditor's report appear to be made and settled on the board of trade, and wagering contracts, is not very plain, and brokers, for the purpose of encouraging speculation and of earning commissions, might be willing to guarantee to their customers that the

contracts made for them on the board of trade should not be enforced, except by a settlement, according to differences in prices.

We do not see why the agreement between the plaintiffs and the defendants, that the defendants should not be required to receive or deliver merchandise, or to pay for or receive pay for merchandise, but should be required to pay to and to receive from the plaintiffs only the differences in prices, is not, as between the parties, open to all the objections which lie against wagering contracts. On the construction we have given to the auditor's report, the plaintiffs, in their dealings with the defendants, in some respects acted as principals. In making the contracts on the board of trade with other brokers, they may have been agents of the defendants. In agreeing with the defendants that they should not be compelled to perform or accept performance of the contracts so made, the plaintiffs acted for themselves as principals. If the defendants had made a contract with the plaintiffs to pay and receive the differences in the prices of pork ordered to be bought and sold for future delivery, with the understanding that no pork was to be bought or sold, this would be a wagering contract. On such a contract the defendants would win what the plaintiffs lose, and the plaintiffs would win what the defendants lose. But so far as the defendants are concerned, the contracts which the auditor has found they made with the plaintiffs are contracts on which they win or lose according to the rise or fall in prices, in the same manner as on wagering contracts. If the plaintiffs, by virtue of the contracts they made with other members of the board of trade, were bound to receive or deliver merchandise, and to pay or receive the price therefor, on the auditor's finding they must be held as against the defendants to have agreed to do these things on their own account, and that the defendants should only be bound to pay to them and to receive from them the differences in prices. If the defendants, as undisclosed principals, should be held bound to other members of the board of trade on the contracts made by the plaintiffs, the plaintiffs by the terms of their employment would be bound to indemnify the defendants, except so far as the contracts were settled, by a payment of differences in prices. The agreement of the parties, as the auditor has found it,

excludes any implied liability on the part of the defendants to indemnify the plaintiffs, except for money paid in the settlement of differences in prices. The position of the plaintiffs towards the defendants is no better than it would have been if the plaintiffs had been employed to make wagering contracts for pork on account of the defendants, and had made such contracts, because the plaintiffs, relying upon the usages of the board of trade, have undertaken to agree with the defendants that whatever contracts they make shall bind the defendants only as wagering contracts, and shall be settled as such.

The plaintiffs contend that, even if the contracts which the defendants authorized them to make and which they made on the board of trade had been wagering contracts, yet they could recover whatever money they had paid in settlement of these contracts in the manner authorized by the defendants.

In *Thacker* v. *Hardy*, 4 Q. B. D. 685, the court found that the plaintiff was employed to make lawful contracts, and ruled that the understanding between the plaintiff and his customer, that the contract should be so managed that only differences in prices should be paid, did not violate the provisions of 8 & 9 Vict. c. 109, § 18. Lindley, J., in giving the opinion at the trial, said, at p. 687 : " What the plaintiff was employed to do was to buy and sell on the Stock Exchange, and this he did ; and everything he did was perfectly legal, unless it was rendered illegal as between the defendant and himself by reason of the illegality of the object they had in view, or of the transactions in which they were engaged. Now, if gaming and wagering were illegal, I should be of opinion that the illegality of the transactions in which the plaintiff and the defendant were engaged would have tainted, as between themselves, whatever the plaintiff had done in furtherance of their illegal designs, and would have precluded him from claiming, in a court of law, any indemnity from the defendant in respect of the liabilities he had incurred : *Cannan* v. *Bryce*, 3 B. & Ald. 179 ; *M'Kinnell* v. *Robinson*, 3 M. & W. 434 ; *Lyne* v. *Siesfield*, 1 H. & N. 278. But it has been held that although gaming and wagering contracts cannot be enforced, they are not illegal. *Fitch* v. *Jones*, 5 E. & B. 238, is plain to that effect." On appeal, Brett, L. J., said, at p. 694 : " It was further suggested in *Cooper* v. *Neil*, W. N., 1 June, 1878,

that the agreement was, that although the plaintiff being broker to the defendant, but contracting in his own person as principal, should enter into real bargains, yet the defendant should be called upon only to pay the loss if the market should be unfavorable, and should receive only the profit if it proved favorable; and that no further liability should accrue to the principal, whatever might become of the broker upon the Stock Exchange; so that, as regarded the real principal, the defendant in the action, it should be a mere gambling transaction. I then considered that a transaction of that kind might fall within the provisions of 8 & 9 Vict. c. 109, § 18, but I thought that there was no evidence of it. And with respect to the present action, I say that there is no evidence that the bargain between the parties amounted to a transaction of that nature. I retract nothing from what I said in that case."

In England, wagering contracts concerning stocks or merchandise are not illegal at common law, and all the judges in *Thacker* v. *Hardy* were of opinion that the facts in that case did not show that the transactions between the parties were in violation of the statute.

In *Irwin* v. *Williar*, 110 U. S. 499, 510, the Supreme Court of the United States says of wagering contracts: "In England, it is held that the contracts, although wagers, were not void at common law, and that the statute has not made them illegal, but only non-enforceable, *Thacker* v. *Hardy, ubi supra,* while generally, in this country, all wagering contracts are held to be illegal and void as against public policy. *Dickson's Executor* v. *Thomas,* 97 Penn. St. 278; *Gregory* v. *Wendell,* 40 Mich. 432; *Lyon* v. *Culbertson,* 83 Ill. 33; *Melchert* v. *American Union Telegraph Co.* 3 McCrary, 521; *S. C.* 11 Fed. Rep. 193 and note; *Barnard* v. *Backhaus,* 52 Wis. 593; *Kingsbury* v. *Kirwan,* 77 N. Y. 612; *Story* v. *Saloman,* 71 N. Y. 420; *Love* v. *Harvey,* 114 Mass. 80." In considering how far brokers would be affected by the illegality of contracts made by them, that court says: "It is certainly true that a broker might negotiate such a contract without being privy to the illegal intent of the principal parties to it which renders it void, and in such a case, being innocent of any violation of law, and not suing to enforce an unlawful contract, has a meritorious ground for the recovery of compensation

for services and advances. But we are also of the opinion that when the broker is privy to the unlawful design of the parties, and brings them together for the very purpose of entering into an illegal agreement, he is *particeps criminis*, and cannot recover for services rendered or losses incurred by himself on behalf of either in forwarding the transaction." This was decided in *Embrey* v. *Jemison*, 131 U. S. 336. See also *Kahn* v. *Walton*, (Ohio, 1888,) 20 N. E. Rep. 203; *Cothran* v. *Ellis*, 125 Ill. 496; *Fareira* v. *Gabell*, 89 Penn. St. 89; *Crawford* v. *Spencer*, 92 Misso. 498; *Lowry* v. *Dillman*, 59 Wis. 197; *Whitesides* v. *Hunt*, 97 Ind. 191; *First National Bank* v. *Oskaloosa Packing Co.* 66 Iowa, 41; *Rumsey* v. *Berry*, 65 Maine, 570.

It is not denied that wagering contracts are void by the common law of Massachusetts; but it is argued that they are not illegal, and that, if one pays money in settlement of them at the request of another, he can recover it of the person at whose request he pays it. It is now settled here, that contracts which are void at common law, because they are against public policy, like contracts which are prohibited by statute, are illegal as well as void. They are prohibited by law because they are considered vicious, and it is not necessary to impose a penalty in order to render them illegal. *Bishop* v. *Palmer*, 146 Mass. 469. *Gibbs* v. *Consolidated Gas Co.* 130 U. S. 396. The weight of authority in this country is, we think, that brokers who knowingly make contracts that are void and illegal as against public policy, and advance money on account of them at the request of their principals, cannot recover either the money advanced or their commissions, and we are inclined to adopt this view of the law. *Embrey* v. *Jemison*, 131 U. S. 336, *ubi supra*, and the other cases there cited.

We are of opinion that the instruction of the presiding justice, that on the auditor's report the plaintiffs were entitled to a verdict, cannot be sustained. Whether on the auditor's report the defendants were entitled to a ruling directing the jury to render a verdict in their favor, or whether the case should have been submitted to the jury for the reasons stated in *Peaslee* v. *Ross*, 143 Mass. 275, is a question which has not been carefully argued, and upon which we express no opinion.

*Exceptions sustained.*