FARMERS' ELEVATOR CO. OF WESTPORT, Respondent, v. QUINN-SHEPHERDSON CO., Appellant.

(·199 N. W. 201.)

(File No. 5183. Opinion filed May 28, 1924.)

1. Corporations—Principal and Agent—Company Receiving Grain from Elevator Company Not Entitled to Deduct from Proceeds Losses on Unauthorized Speculations by Manager of Elevator.

A company to which the manager of an elevator company, without authority of its directors, shipped grain, and through which he bought and sold large quantities of grain for future delivery on speculative market, held liable to directors of elevator company for the full proceeds of grain actually received by it, and not entitled to deduct losses of manager in the speculative transactions.

2. Corporations—Principal and Agent—Trial—Burden of Proof— Burden of Proof Stated, Where Corporation Sued Third Person on Account of Alleged Unauthorized Transactions by Agent.

Where an elevator company, suing to recover the proceeds of grain shipped by its manager and retained by the consignee to cover losses of manager in speculative transactions, has established that such transactions were unauthorized gambling devices, burden is then upon defendants to show plaintiff's agent was acting within his authority in buying and selling on speculative market.

Appeal from Circuit Court, Brown County; Hon. Frank Anderson, Judge.

Action by the Farmers' Elevator Company of Westport against the Quinn-Shepherdson Company and another. From judgment for plaintiff, and order denying motion for new trial, defendants appeal. Judgment and order affirmed.

Gray & Eaton, C. O. Newcomb, of Minneapolis, Minn., and George H. Fletcher, of Aberdeen, for Appellants.

Van Slyke & Agor, of Aberdeen, for Respondent.

Respondent cited: Melchert v. Telegraph Co., 11 Fed. 193; Edwards v .Hoffinghof, 38 Fed. 639; Weir Commission Co. v. People (Ill.) 70 N. E. 1080; Sunderland & Sanders v. Hibbard, 149 N. W. 59; Pope v. Hanky, 40 N. E. 840; Corey v. Meyers, L. R. A. 1916B, 1056; Jamieson v. Wallace, 47 N. E. 762; Carson v. Milwaukee Produce Co., 113 N. W. 393; Wagner v. Englehart Co., 129 N. W. 392; Atwater v. Manville, 81 N. W. 985; Cocey & Carkener v. Wilwright, 156 Pac. 169; Barnard v. Backus, 9 N. W. 595.

DILLON, J. This action is to recover money lost by gambling speculations on the Board of Trade in Minneapolis by plaintiff's manager, through sales and purchases made through defendant (appellant) company. The case was tried to a jury; verdict in the sum of $9,354.84 was returned in favor of plaintiff. This appeal is from the judgment and order denying appellant's motion for a new trial.

[1] The plaintiff company owned and operated a small grain elevator at Westport, this state. One Vern Neer acted as manager of plaintiff's elevator during a portion of the years 1919 and 1920. During this time, without the knowledge of the plaintiff board of directors, he shipped to Quinn-Shepherdson Company 13 carloads of grain of the net value of $23,584. He entered into a series of transactions with Quinn-Shepherdson Company through one James Leary, defendant, local agent at Aberdeen, this state, whereby he pretended to buy for future delivery 265,000 bushels of rye, wheat, oats and barley. Not a bushel of this grain was actually delivered, but such grain was all closed out or sold before the time for delivery arrived and settlement was made upon the basis of the difference between the

market value at the time of the purchase and the time of the sale. The loss on these transactions amounted to $8,504.03. A further loss of $850.81 in a separate transaction was sustained, according to a report submitted by Quinn-Shepherdson Company, by reason of Vern Neer's failure to deliver 5 carloads of grain which they claim he sold to the company for future delivery, and which he failed to deliver, and they were compelled to go into the market and buy at a higher figure than that at which he had agreed to sell. This loss was deducted by defendant company from the money in its hands, derived from the sale of actual grain shipped by Neer to defendant company for sale on the market. The total loss on all of these transactions was $9,354.84.

The directors of plaintiff company knew nothing about the dealings in actual grain or in futures between Neer and defendant company, until about January 1, 1921. It is conceded that Neer was authorized to hedge against stored grain to be shipped out, for which he had issued storage tickets, but Neer had been directed to conduct such hedging operations as were necessary to protect actual stored grain through McCall-Dinsmore Company, Minneapolis. At the monthly meetings of the directors, Neer reported his hedging operations with McCall-Dinsmore Company, but made no report of any dealings with defendant company.

During the season of 1920, the Farmers' Elevator Company received and shipped less than 100,000 bushels of grain and only 5,000 bushels of rye and not more than one-fourth of this total was stored grain. Plaintiff's elevator at Westport is a small, country elevator with a capacity of about 20,000 bushels. The defendants knew the capacity of plaintiff's elevator, and were familiar with the business that plaintiff was conducting. The threshing season of 1920 opened about August 20th and on August 25, 1920, Vern Neer, manager of plaintiff's company, bought from defendant company through defendant Leary, 10,000 bushels of rye and on August 28, 1920, he bought another 10,000 bushels of rye. and at the time of the opening of the threshing season plaintiff's elevator was empty.

It further appears that Neer bought from defendant company, through Leary, 265,000 bushels of rye, wheat, oats, and barley for future delivery, and closed every single transaction before the time to deliver the same, and in each case the loss

was charged or profit credited to the defendant company. The defendant company made no arrangement to actually deliver any of the grain which Neer pretended to purchase. No inquiries were made as to when this grain was to be received or how it was to be handled, and no investigations were made of any of Neer's purchases to ascertain what authority he had in making them.

In the latter part of December, 1920, a fire occurred, and shortly after defendant admitted statement of the losses alleged to have been sustained by Neer through dealings in futures with defendants.

It is claimed by respondent that Neer in his dealings with defendants was not acting for plaintiff but for himself in buying and selling futures in the grain exchange, which was conducted in plaintiff's name without the knowledge of plaintiff's officers. He shipped out 13 cars of plaintiffs' grain, and wrongfully used the proceeds of the plaintiffs' officers. Thte elevator company was not bound by these unlawful acts as they constituted gambling transactions.

Appellants contend that the court erred in refusing to direct a verdict for defendants, and that the plaintiff's officers had ratified and approved of these transactions; also that they were only hedging transactions made by Neer in the due course of business.

In Irwin v. Williar, 110 U. S. 499, 4 Sup. Ct. 100, 28 L. ed. 225, it is said:

"'It makes no difference that a bet or wager is made to assume the form of a contract. Gambling is none the less such because it is carried on in the form or guise of legitimate trade.' It might therefore be the case that a series of transactions, such as that described in the present record, might present a succession of contracts, perfectly valid in form, but which on the face of the whole, taken together, and in connection with all the attending circumstances, might disclose indubitable evidences that they were mere wagers. The jury would be justified in such a case, without other evidence than that of the nature and circumstances of the transactions, in reaching and declaring such a conclusion."

In Dows v. Glaspel, 4 N. D. 251, 60 N. W. 62, the North Dakota court held: (1) There was no talk of actual delivery at any time. (2) There was no mention of names of the brokers

who had agreed to sell or accept the grain in question.   (3) All of the grain which the parties pretended to buy and sell was closed out before the time for actual delivery.   (4) Defendant was a lawyer, and manifestly had no use for the grain which he pretended to deal in, and yet the evidence showed that the defendant in that case had a large farm, and at the time he was dealing with the plaintiff he had 5,000 bushels of actual grain. (5) The fact that there was no testimony on the part of the plaintiff to show defendant's financial ability to pay for the grain which he had contracted to pay was a circumstance which the court said showed bad faith on the part of the plaintiff.

In the pending case the testimony showed that every single transaction was closed out before the time for delivery actually arrived; this alone is a circumstance showing that the parties did not intend to deliver or receive any actual grain.   It would seem that when the parties entered into a series of transactions in futures, intending at the time the transactions were made, to deliver actual grain and then changed their minds some seventy times, as disclosed by Exhibit 1, in closing out these transactions on the Board of Trade rather than delivering any actual grain, that that in itself ought to be strong evidence of what the parties intended to do in the first place.

In Dows v. Glaspel, supra, the North Dakota court says:

"But, however, perfect the likeness of a gambing transaction to the form and features of a legitimate sale, the legality of the dealings between the parties must rest ultimately upon their honest intention.   Illegality is seldom guilty of the consummate folly of flaunting its defiance of law in the face of public sentiment—of furnishing itself the evidence of its violation of law.   To escape the penalties of breaking the law, it will always put on the 'suits and trappings' of honest transactions.   Mere wagering contracts, invariably wear the garb of bona fide sales.   This is common knowledge.

"Myriads of gambling operations are daily arranged by two interested brokers, who fatten on the folly of their dupes, in the decent and decorous habiliments of lawful business transactions. The naivete of a tribunal which in such cases should unquestionably take the semblance for the substance would indeed be pitiable, if it did not excite derision and contempt.   The courts have

always sought to pierce the disguise, and ascertain the real inten-tion of the parties."

[2]   The evidence is clear that these directors had no knowl-edge of Neer's speculations.   It appears that plaintiff's books were burned, and we fail to find any testimony where plain-tiff's directors ratified or in any manner acquiesced in these un-lawful activities.   The first information the plaintiff had of these acts was a report after the loss, made on the part of the defend-ants.   The shortage was either in grain or in funds as shown by the evidence.   When the plaintiff had shown that these trans-actions were unauthorized and gambling devices, the burden of proof then rested upon the defendants to show that the agent was acting within his authority in buying and selling such grain on the speculative market and having failed to do so, it must be required to account for all grain shipments received.

We find no prejudicial error in the admission or rejection of testimony or in the instructions given or in refusing appellant's requested instructions.   The evidence justified the verdict of the jury, and we find no cause of complaint against the verdict of the jury.

The judgment and order are affirmed.

POLLEY and GATES, JJ., concur in the result.

ANDERSON, J., not sitting.

Note.—Reported in 199 N. W. 201.   See, Headnote (1), Ameri-can Key-Numbered Digest, Corporations, Key-No. 410, 14A C. J. Sec. 2299; (2) Corporations, Key-No. 432(5), 14A C. J. Sec. 2251.