### BURKE GRAIN CO. v. ST. PAUL–MERCURY INDEMNITY CO.*
No. 10973.

Circuit Court of Appeals, Eighth Circuit.
Feb. 11, 1938.

*Writ of certiorari denied 58 S.Ct. 765, 82 L.Ed. ——.

Tom Kirby, of Sioux Falls, S. D. (Hugh S: Gamble, of Sioux Falls, S. D., on the brief), for appellant.

Holton Davenport, of Sioux Falls, S. D. (George J. Danforth, of Sioux Falls, S. D., on the brief), for appellee.

Before STONE, GARDNER, and WOODROUGH, Circuit Judges.

GARDNER, Circuit Judge.

In this case the appellee as plaintiff below brought this action at law to recover from appellant as defendant funds in the amount of $25,000, representing losses in certain transactions alleged to be wagering in character. Burke Grain Company, a corporation, and J. C. Vandagrift were named as defendants below, and we shall refer to the parties as they were designated in the lower court.

Plaintiff is a surety company, and on or about July 21, 1934, it executed a fidelity bond to the Union Savings Bank, of Sioux Falls, S. D., as obligee, by the terms of which it agreed to reimburse the said bank for any embezzlement or wrongful abstraction of the funds of the bank by said J. C. Vandagrift, up to the sum of $25,000. Vandagrift was president and active managing officer of the Union Savings Bank during all the times in question, and embezzled and wrongfully abstracted various sums of money from the bank amounting to approximately $96,000. Plaintiff reimbursed the bank to the extent of its liability, to wit, $25,000, and thereby became subrogated to such rights as the bank might have against the defendant Burke Grain Company. Of the funds so embezzled by Vandagrift from the bank, some $93,000 was placed directly by him to the account of the Burke Grain Company in the Union Savings Bank. The Burke Grain Company was and is a brokerage concern, and S. A. Burke, its president and managing officer was a member of the Chicago Board of Trade, thereby entitling the grain company to its trading privileges.

Vandagrift had transactions with the grain company in the form of orders for the purchase or sale of grain for future delivery. The grain company acted as broker and consummated these transactions

through a correspondent, generally on the Board of Trade in Chicago. Vandagrift was required to keep a margin or deposit with the grain company, and the grain company received a commission on each alleged sale or purchase. When the purchase or sale was made, the grain company notified Vandagrift, using a form indicating that it had bought or sold for his risk and account a certain quantity of grain, describing the transactions. Shortly after the purchase or sale, Vandagrift would close out the transaction by an offsetting sale or purchase, and would be credited or charged on the books of the Burke Grain Company with either the profit or loss. As losses depleted the margins deposited, additional deposits were required which he from time to time made. It is claimed that these transactions were gambling transactions, and therefore illegal, in that neither of the parties intended an actual purchase and sale, but it was the purpose of Vandagrift merely to speculate in the rise or fall in prices, and the grain was not to be delivered, but one of the parties was to pay the other the difference between the contract price and the market price of the wheat dealt in at the date fixed for executing the contract.

It was contended in the lower court, and asserted here, that there was no valuable consideration for the transfer of the money to the Burke Grain Company, and hence the bank, the real owner of the money, had a right to recover it. It was also contended that, even if the contracts were not void by reason of the gambling character of the transactions, yet the grain company knew, or should be charged with notice, that the money did not belong to Vandagrift, and hence it did not act in good faith, and plaintiff should be entitled to recover.

At the conclusion of all the evidence, plaintiff interposed a motion for directed verdict in its favor. Defendant also made a motion for a directed verdict, but embodied in its motion the following request: "And the defendant asks that this motion of the defendant be considered by the court separate and apart from the motion of the plaintiff, and that if the defendant's motion is denied, that the issues of fact be submitted to the jury." The court announced that, as both parties had moved for a directed verdict, that eliminated any jury issue, and the jury was thereupon discharged.

The court found that the transactions were gambling in character, announced orally that it found for the plaintiff on all the issues, and requested plaintiff's attorneys to prepare and submit findings in the form of judgment. Counsel for defendant excepted on the ground that the ruling of the court denied its right to have the issue of fact submitted to the jury, because it had reserved that right in its motion. Two days later, plaintiff submitted to the court findings of fact and conclusions of law, which the court signed. To some of these defendant excepted. It submitted proposed findings of fact, which the court refused to make, and defendant excepted, and judgment was thereupon entered for plaintiff. On application the grain company was granted an order of severance, and it alone prosecutes this appeal. It seeks reversal on substantially the following grounds: (1) It was error for the court to discharge the jury and decide the disputed questions of fact, in view of the reservation contained in defendant's motion for a directed verdict; (2) the court erred in holding that the transactions between Vandagrift and the Burke Grain Company were gambling transactions; (3) the court erred in holding that the Burke Grain Company was put on notice that the funds or credits transferred to it were embezzled by Vandagrift from the bank; (4) that it could not be said as a matter of law, or from the undisputed evidence, that the transactions were gambling transactions, and hence the evidence should have been submitted to the jury for their determination.

1. The first question presented is one of practice. When both of the parties interposed a motion for directed verdict, the court took the view that this dispensed with the jury and amounted to submitting any dispute in the evidence to the court for its determination, and this is doubtless the general rule. But here the defendant did something more. It embodied in its motion for a directed verdict a reservation by which it requested that, if its motion should be denied, the issues of fact be submitted to the jury. Where the request is so coupled with a reservation, the party does not waive the right of trial by jury. General Tire Co. v. Standard Accident Ins. Co., 8 Cir., 65 F.2d 237, 239; Aetna Ins. Co. v. Kennedy, 301 U.S. 389, 57 S.Ct. 809, 811, 81 L.Ed. 1177.

In the last-cited case after stating the established rule with reference to an unreserved motion for a directed verdict, it is said: "But, as the right of jury trial is fundamental, courts indulge every reasonable presumption against waiver. And unquestionably the parties respectively may request a peremptory instruction and, upon refusal of the court to direct a verdict, have submitted to the jury all issues as to which opposing inferences may be drawn from the evidence."

In General Tire Co. v. Standard Accident Insurance Co., supra, the opinion in which was written by Judge Van Valkenburgh, it is said: "It is well settled that where the request for directed verdict is coupled with a reserved right to submit further requests for instructions, if that for a directed verdict is refused, no waiver of trial by jury results. * * * No doubt the proper and usual practice is to couple the request for a directed verdict with a reservation, in some form, contingent upon the overruling of that motion."

██ Recognizing the effect of this rule, plaintiff urges that the reservation was not sufficiently specific as to the issues which defendant desired to have submitted to the jury, to avoid the waiver of the right to trial by jury. But, as said by the Supreme Court, in the Kennedy Case, supra: "As the right of jury trial is fundamental, courts indulge every reasonable presumption against waiver." We think the reservation in defendant's motion was sufficient to repel the inference that it was waiving its constitutional right to a jury trial. American Cyanamid Co. v. Wilson & Toomer Fertilizer Co., 5 Cir., 51 F.2d 665.

██ It is further contended that by requesting special findings, and excepting to those proposed by plaintiff, defendant waived the right to have a jury pass on the issues. If in this regard we must follow the practice in South Dakota, then we think it clear that defendant, by invoking the decision of the court upon the facts, waived its right to complain of the ruling of the court which deprived it of a jury trial.

In Sioux National Bank v. Lundberg, 54 S.D. 581, 223 N.W. 826, 828, the lower court, after both parties had moved for a directed verdict, but the appellant had made it plain that there was no intention to waive the right to trial by jury on issues of fact, discharged the jury, and announced that it would decide the case. Thereafter appellant prepared and presented to the trial court proposed findings of fact and conclusions of law, and requested that they be adopted. The Supreme Court on this question said: "When appellant did this, he himself invoked the decision of the court upon the facts and thereby conceded that the facts were for the court to decide. By so doing, he lost the benefit of his previous reservation of the right to go to the jury and stands in the same position as though he had made no such reservation and the case is in the same situation as though both parties had moved for directed verdict without reservation, thereby waiving a jury, and the court had dismissed the jury and made findings."

We note in passing that there was an able dissenting opinion by one of the judges on this point.

Plaintiff here insists that the Conformity Act, 28 U.S.C.A. § 724, is controlling. The Conformity Act provides that in law cases the practice, pleadings, and forms and modes of proceeding shall conform "as near as may be, to the practice, pleadings, and forms and modes of proceeding existing at the time in like causes in the courts of record of the State within which such district courts are held, any rule of court to the contrary notwithstanding."

██ This act was not intended as an unqualified adoption of the state practice in law actions, but, as the use of the words "as near as may be" indicates, it was intended to vest a judicial discretion in federal judges as to what extent they would adopt the practice and procedure of the state. And, while the qualification is not to be construed as authorizing a disregard of the act, yet the federal judges may reject any subordinate requirements of the state practice which would encumber the administration of the law or defeat the ends of justice in the federal tribunals, and it contemplates necessary variations from the state practice growing out of the different organization of the courts. Shepard v. Adams, 168 U.S. 618, 18 S.Ct. 214, 42 L.Ed. 602; Herron v. Southern Pac. Co., 283 U.S. 91, 51 S.Ct. 383, 75 L.Ed. 857; City of St. Charles v. Stookey, 8 Cir., 154 F. 772; Sligo Furnace Co. v. Dalton, 8 Cir., 255 F. 532; Hawthorne v. Bankers' Life Co., 8 Cir., 63 F.2d 971; Inter-Southern Life Ins. Co. v. Klaber, 8 Cir., 50 F.2d 154; American Surety Co. v.

Cotton Belt Levee Dist. No. 1, 8 Cir., 58 F.2d 234; Clauson v. United States, 8 Cir., 60 F.2d 694; Gerlach v. Chicago, R. I. & P. Ry. Co., 8 Cir., 65 F.2d 862.

The making of special findings by a federal District Court on waiver of a jury, and the effect thereof, is governed by federal statutes and not by state statutes, and we have held, following the rule of the Supreme Court that, where a party fails to request findings or declarations of law, or to interpose a motion for judgment at the close of the evidence, or like action to challenge the rulings of the court, no review of the evidence may be had, regardless of what the state practice may be. In South Dakota, when a law action is tried to the court without a jury, the sufficiency of the evidence to sustain the findings of the trial court can be and ordinarily must be challenged by motion for new trial, on denial of which a review upon appeal from the order denying the motion may be had. Cleveland Stone Co. v. Hollingsworth, 63 S.D. 586, 262 N.W. 171; Keyes v. Baskerville, 42 S.D. 381, 175 N.W. 874; Western Surety Co. v. Walter, 44 S.D. 112, 182 N.W. 635, 24 A.L.R. 1519; Anderson v. Bruflat, 40 S.D. 407, 167 N.W. 397.

Section 3169, South Dakota Revised Code of 1919, provides that any questions of fact or law decided upon trial by the court or referee may be reviewed when exceptions to the findings of fact have been taken by either party. In Irwin v. Lattin, 29 S.D. 1, 135 N.W. 759, Ann.Cas.1914C, 1044, the Supreme Court of that state held that it was not necessary to decide whether the sufficiency of the evidence might be reviewed upon exceptions to the findings of fact, and in Keyes v. Baskerville, supra, it was held that the question of the sufficiency of the evidence could not be reviewed upon appeal from the judgment, which did not embody an appeal from the order overruling motion for new trial.

It is clear from the South Dakota authorities that the action of appellant in Sioux National Bank v. Lundberg, supra, was purely voluntary and not necessary to preserve any rights on appeal. It was a clear invitation and request to the court to act without a jury, but the situation in federal courts is to be distinguished. The only way of challenging the sufficiency of the evidence under the federal practice is by motion for a directed verdict, whereas, under the South Dakota practice this question is raised by appeal from the order denying a motion for new trial based upon the alleged insufficiency of the evidence. A waiver must of necessity be an intentional act. The defendant had to meet the situation as the court presented it, even though it acted erroneously. The situation with which the defendant was here confronted is similar to that discussed by the Supreme Court of Missouri in McKee v. Rudd, 222 Mo. 344, 121 S.W. 312, 320, 133 Am.St. Rep. 529, where objection was made by defendants to oral evidence based upon the statute of frauds. The court, however, overruled the objection, and the defendants then introduced oral evidence. It was held that the defendants had not waived the objection by so doing. The court said: "Defendants had urged that plaintiff was not entitled to make proof of his allegations by parol evidence, but their objections to oral proof were overruled. It will not do to say, because after this ruling of the court they then testified to their understanding of the same conversation, they thereby waived the question as to the validity of oral proof. Waiver is a voluntary act, and is not an act forced upon a party by the court."

We are of the view that the defendant did not waive the right to a jury trial by subsequently, after the court had ruled adversely upon the motion, requesting special findings.

But, while it was error in the court to hold that the defendant had waived its right to a jury trial by interposing its motion with reservations for a directed verdict, it does not follow that this error resulted in prejudice to the defendant or requires a reversal. It could only be prejudicial if there were in fact substantial evidence upon which the jury might properly have returned a verdict in favor of the defendant. As said by us in General Tire Co. v. Standard Accident Ins. Co., supra: "However, although taking the case from the jury was erroneous, nevertheless 'the verdict will be sustained if the evidence was of such a conclusive character that it would have been the duty of the court to set aside the verdict had it been for the other party.' Empire State Cattle Co. v. Atchison, T. & S. F. Ry. Co., supra [210 U.S. 1, 28 S.Ct. 607, 52 L.Ed. 931, 15 Ann. Cas. 70]."

2. Were the transactions between Vandagrift and the Burke Grain Company gambling transactions?

The court made specific findings covering the embezzlements of Vandagrift from the bank of which he was then president and managing officer, and the court found that the funds so embezzled had been placed to the credit of the grain company and used in the transactions claimed by the plaintiff to be gambling transactions. No complaint is made as to these findings of embezzlement and the use of the funds, but it is contended that the transactions were regularly carried on pursuant to the rules and regulations of the Board of Trade of the City of Chicago and were not gambling in character. On this issue the court found as a matter of fact: "That in said transactions in the buying and selling of such grains for future delivery the said J. C. Vandagrift did not, in fact, intend to receive delivery of any such grains purchased by him or to make delivery of any such grains sold by him, but, on the contrary, the said J. C. Vandagrift intended, before the appointed time for such delivery, to close out each of said transactions by a counter or setting off sale or purchase of an identical quantity of the same identical kind of grain for delivery in the same identical month, and to have said transactions adjusted on the basis of profit or loss to the said J. C. Vandagrift according to the market fluctuations between the time of the original transaction and the counter or offsetting transaction; that such intent on the part of the defendant J. C. Vandagrift was known to the defendant Burke Grain Company throughout said period of said transactions."

Sections 3925 and 3926 of the South Dakota Revised Code of 1919 read as follows:

"§ 3925. It shall be unlawful for any person to keep within this state any store, office or other place for the pretended buying or selling of grain, pork, lard or any mercantile, mining or agricultural products or corporation stocks, on margins, without any intention of future delivery, whether such pretended contracts are to be performed within or without the state; and no person within this state shall make or enter into such contract or pretended contract; the intention of this section being to prohibit within this state the business conducted in places commonly known as bucket shops."

"§ 3926. Any person guilty of violating any provision of the preceding section, upon conviction thereof, shall be punished by a fine not less than one hundred dollars nor more than five hundred dollars, or by imprisonment in the county jail not less than thirty days nor more than one year, or by both such fine and imprisonment."

These statutes were adopted in 1905, but, even before their adoption, the Supreme Court of that state, in Waite v. Frank, 14 S.D. 626, 86 N.W. 645, 646, had held that a contract which in form provided for the purchase or sale of commodities for delivery in the future with no intention that such commodities should be received or delivered was a gambling contract and void. In that opinion the court said: "It is well settled that where a contract for the delivery and sale of wheat, corn, and other commodities in the future is not made with the intention that such commodities shall be received or delivered, but with the understanding, either express or implied, that the transaction shall be settled by the payment of the difference between the contract price and the market price at the time fixed, or some future time, such a contract is a mere wager or gambling contract, and is therefore void. * * * The intention of the parties in such case may be determined from the nature of the transaction, and from the manner and method of carrying on the business. * * * In the case at bar it is clear from the evidence of the defendant that he had no intention at the time he entered into the contract with the plaintiff, or at the times of giving orders for the purchases and sales of wheat, corn, and other commodities, to receive or deliver any of the commodities so purchased or sold; and, while it is true there is no positive evidence that it was not the intention of the plaintiff to receive and make deliveries of the commodities contracted to be bought and sold, yet we are of the opinion that the circumstances under which the loan was made, and the orders to buy and sell given, and from the manner of transacting business on the plaintiff's stock exchange at Deadwood, the court was fully justified in finding that he had no actual intention in buying and selling the commodities ordered by the defendant of re-

ceiving or delivering the same, but did intend that settlements should be made upon the differences between the market and the purchase prices of the commodities."

Subsequent to the adoption of these statutes, the Supreme Court of South Dakota, without special reference to the statutes, followed the doctrine of Waite v. Frank, supra. Hallet v. Aggergaard, 21 S. D. 554, 114 N.W. 696, 14 L.R.A., N.S., 1251; Farmers' Elevator Co. v. Quinn-Shepherdson Co., 47 S.D. 438, 199 N.W. 201; Morrow v. Quinn-Shepherdson Co., 48 S.D. 477, 205 N.W. 38. In fact, we think the rule as thus announced is in accord with what may be said to be the American common law. If, as found by the court, the real intent of both parties was merely to speculate in the rise or fall of prices and the wheat was not to be delivered, but at the time fixed for delivery one of the parties was to pay to the other the difference between the contract price and the market price, the whole transaction, even though carried on under the guise of a contract of sale, must be considered as a wager and hence invalid. Clews v. Jamieson, 182 U.S. 461, 21 S.Ct. 845, 45 L.Ed. 1183; Bibb v. Allen, 149 U.S. 481, 13 S.Ct. 950, 37 L.Ed. 819; Lloyd v. Preston, 146 U.S. 630, 13 S.Ct. 131, 36 L.Ed. 1111; Pearce v. Rice, 142 U.S. 28, 12 S.Ct. 130, 35 L.Ed. 925; Irwin v. Williar, 110 U.S. 499, 4 S.Ct. 160, 166, 28 L.Ed. 225; Dows v. Glaspel, 4 N.D. 251, 60 N.W. 60, 62; Harvey v. Merrill, 150 Mass. 1, 22 N.E. 49, 5 L.R.A. 200, 15 Am.St.Rep. 159.

Did the evidence, viewed in the light most favorable to the defendant, compel the court's finding on this issue? This necessitates some review of the evidence.

Sioux Falls is a city of less than 35,000 population. The Union Savings Bank, of which Vandagrift was president and managing officer, was a relatively small bank, with total assets not exceeding $1,440,000, including capital of $200,000, surplus $40,000, and deposits of about $1,200,000. The working force of the bank consisted of Vandagrift, a vice president, two assistant cashiers, two clerks or stenographers, a bookkeeper and a field man. Vandagrift owned 550 out of 2000 shares of the capital stock, of the par value of $100 a share. The book value of the stock was $120 a share, so that Vandagrift's shares had a book value of $66,000. He testified that he thought his stock was worth $175 to $180 a share during 1936, but that he did not know its actual market value. All of his bank stock, except thirty or forty shares, was pledged at banks to secure loans of from $30,000 to $40,000. He had 400 acres of farm land, mortgaged for $10,000 or $11,000, which he testified he considered during the embezzlement period had an equity of some $10,000 to $11,000, but in which, in a statement made by him in September, 1936, after the embezzlement was discovered, he said he had no equity. He had some other stocks, life insurance on which he had borrowed up to within $2,000 or $3,000 of the cash surrender value, some vacant lots in Florida, which he testified were worth $10,000 at the time, but which he valued at $2,000 or $3,000 in the statement of September, 1936. The home was in his wife's name, and it was mortgaged for over $4,000.

The transactions between Vandagrift and Burke Grain Company commenced August 31, 1932, and concluded September 11, 1936. During this period the state banking authorities examined the bank, but Vandagrift was advised of the coming examinations and concealed his embezzlements. These embezzlements were finally discovered through an examination for the Federal Deposit Insurance Company. Not including offsetting transactions, which would double the amounts, the evidence showed that during this period 548 separate transactions occurred, involving 19,256,000 bushels of grain, at a total cost or price of $17,981,469.50. Embezzlements apparently commenced June 7, 1934. Prior to that period there were 207 transactions, involving 4,330,000 bushels of grain, at a total cost or price of $3,240,440.75. During the embezzlement period there were 341 transactions, totaling $14,741,028.75. The average size of each transaction during the embezzlement period was 44,000 bushels, at an average cost of $44,000. Throughout the entire period the average size of the transactions was approximately 36,000 bushels at an average cost of approximately $35,000. The deals were handled on margins. Vandagrift rarely waited more than a few days without closing an original transaction with an offsetting purchase or sale.

Burke, representing the grain company, and Vandagrift had been acquainted fifteen or sixteen years, but they had no business transactions until Vandagrift started his grain operations in 1932. Burke knew in a general way the size of the Union Savings Bank, and assumed that Vandagrift's salary

was between $6,000 and $10,000 a year. He did not know anything about Vandagrift's financial condition, but assumed that he was a man of considerable means. He knew that he owned the largest block of stock in the bank and understood he had considerable land, and knew nothing of his debts. The information he had concerning Vandagrift came from his friends. Burke never made any investigation to determine what his resources were. Vandagrift was not in the grain business. He neither owned nor controlled elevators nor storage houses, and he never received nor delivered any grain during these transactions. These and many other facts and related circumstances are relied upon by the plaintiff as conclusively establishing the gambling character of these transactions.

It is urged by the defendant that the settled law of this court and of the Supreme Court determines the issue of the nature of these transactions in favor of their validity.

In Cleage v. Laidley, 8 Cir., 149 F. 346, the opinion in which was written by the late Judge Sanborn, it was held that contracts for future delivery made with the intention of settling them by paying to the other parties to the contracts the difference between the contract price and the market price at the times of delivery were wagers and hence void, but that contracts for future delivery made with the intention of settling them by set-off or by ringing-off and by the payment of differences in accordance with the rules and practices of the Board of Trade were valid and enforceable. The same doctrine was reiterated in the later cases of Gettys v. Newburger, 8 Cir., 272 F. 209, and Solomon v. Newburger, 8 Cir., 35 F.2d 328. These were both cases in which either directly or through a broker one not a member of an exchange entered into transactions on a board of exchange. They were based upon the decision of the Supreme Court in Board of Trade v. Christie Grain Company, 198 U.S. 236, 25 S.Ct. 637, 639, 49 L.Ed. 1031. That case, however, goes no further than to decide that settlement of differences by the method of set-off or ringing-off between members of a board of trade, or exchange, is valid. In the opinion of Mr. Justice Holmes it was said: "We speak only of the contracts made in the pits, because in them the members are principals. The subsidiary rights of their employers where the members buy as brokers we think it unnecessary to discuss."

The principle of that case was held by this court in the above cases to apply to a situation where a nonmember, through a broker, purchased or bought grain on the exchange for future delivery and satisfied his contract by purchase or sale to cancel the first contractual obligation and either paid or collected the difference. But in the later case of Dickson v. Uhlmann Grain Company, 288 U.S. 188, 53 S.Ct. 362, 364, 77 L.Ed. 691, 83 A.L.R. 492, this distinction is noted. Dickson was a customer of a broker which made contracts for him on the exchange. The court said: "It does not follow that because the contracts between the members of the exchanges were valid, those entered into by the company at Carrollton with Dickson and its other customers were valid also."

The necessary effect of the decision in Dickson v. Uhlmann Grain Company, supra, and the distinction pointed out in Board of Trade v. Christie Grain Company, supra, which is emphasized by repetition in the later case of Dickson v. Uhlmann Grain Company, is to say the least to cast serious doubt upon the decisions of this court commencing with Cleage v. Laidley and terminating with Solomon v. Newburger, supra. As applied to nonmembers of a board of trade or a grain exchange, we think the rule of these cases can no longer be followed.

Vandagrift's purchases could not have contemplated a receipt or delivery of grain. At times the transactions were as high as 100,000 bushels of wheat. Physically, he could not have contemplated use for any of the grain, and he was not in financial condition to pay for any such amounts of grain. The purchase and sale of grain was foreign to his business, and the conclusion is irresistible that he was merely using the mechanism of the grain exchange as a means of establishing a gain or loss on each transaction initiated by purchase or sale, with no thought that the transactions were to have any substance or effect, except as chance might establish a gain or loss. The defendant could scarcely have had any other conception of Vandagrift's purpose. Mr. Burke's knowledge of Vandagrift's financial ability was not sufficient to warrant a belief that he could afford to make actual purchases in the amounts he made. The putting up of margins appears to have been to protect the defendant from losses that might be anticipated from Vandagrift's gambling. There

was never a suggestion that Vandagrift should actually take or deliver the grain. So far as appears from the evidence, he neither knew nor cared about the person from whom he was buying or to whom he was selling. The formal utterances of the broker that actual delivery in each was contemplated were mere forms. As said in Irwin v. Williar, supra: "It makes no difference that a bet or wager is made to assume the form of a contract. Gambling is none the less such because it is carried on in the form or guise of legitimate trade." The same thought is expressed by the Supreme Court of North Dakota in Dows v. Glaspel, supra, where it is said: "But, however perfect the likeness of a gambling transaction to the form and features of a legitimate sale, the legality of the dealings between the parties must rest ultimately upon their honest intention. Illegality is seldom guilty of the consummate folly of flaunting its defiance of law in the face of public sentiment—of furnishing itself the evidence of its violation of law. To escape the penalties of breaking the law, it will always put on the 'suits and trappings' of honest transactions. Mere wagering contracts invariably wear the garb of bona fide sales. This is common knowledge."

The evidence so conclusively established the gambling character of these transactions that a verdict for the defendant on that issue would be set aside as not sustained by any substantial evidence.

3. The contracts were therefore void, and, while Vandagrift might not have been permitted to plead their invalidity because he was in pari delicto with the defendant, yet the bank whose money was used by Vandagrift and lost in these transactions was entitled to recover, and this regardless of whether the defendant knew or ought to have known that the funds turned over to it by Vandagrift were those of the bank. Morrow v. Quinn-Shepherdson Co., supra; Central Stock & Grain Exchange v. Bendinger, 7 Cir., 109 F. 926, 56 L.R.A. 875; Joslyn v. Downing, Hopkins & Co., 9 Cir., 150 F. 317. The question of the defendant's knowledge of the source of these funds could only have been important if the contracts were otherwise valid ones.

4. It is finally urged that the bank should be estopped because it should have known of the speculations of Vandagrift. It did not in fact know through any officer or director, and, of course, it was not charged with the knowledge which Vanda-grift had. The embezzlements were not discovered until September, 1936. There would be no estoppel against the bank, and hence none could be pleaded against the plaintiff who succeeded to all the rights of the bank.

The judgment appealed from is therefore affirmed.