CLEAGE v. LAIDLEY et al.

(Circuit Court of Appeals, Eighth Circuit. November 8, 1906.)

No. 2,413.

1. BANKRUPTCY—INVOLUNTARY BANKRUPT—NATURAL PERSON NOT ENGAGED IN MANUFACTURING OR TRADING MAY BE.

A natural person may be adjudged an involuntary bankrupt, although he is not "engaged principally in manufacturing, trading, printing, pub‑ lishing or mercantile pursuits." The quoted clause qualifies "any corpo‑ ration" only. U. S. Comp. St. 1901, p. 3423, § 4b, 30 Stat. 547, c. 541, § 4b.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 6, Bankruptcy, § 40. What persons are subject to bankruptcy law, see note to Mattoon Nat. Bank v. First Nat. Bank, 42 C. C. A. 4.]

2. GAMING—WAGERS—CONTRACTS FOR FUTURE DELIVERY VALID—INTENTION OF PARTIES TO SETTLE BETWEEN THEMSELVES ON DIFFERENCES MAKES WA‑ GERS AND VOID.

Contracts for the purchase and sale for future delivery of grain or other personal property are lawful and valid. But the intention of the parties to such a contract to discharge their obligations under it by the payment by one of the parties to the other of the difference between the contract price and the market price of the commodity sold, and never to make or accept any delivery, renders the agreement a wager and makes it void.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 24, Gaming, §§ 22, 25.]

3. SAME—INTENTION TO SELL CONTRACT BEFORE TIME OF PERFORMANCE DOES NOT AVOID.

A sale of a contract for future delivery, or of rights under it, before the time of delivery, is not unlawful. An intention by the parties to such a contract to sell it, or to sell their rights under it before the day of deliv‑ ery, so that they will not deliver or receive any of the contracted com‑ modity does not make the contract a wager nor avoid it. Ponder v. Je‑ rome Hill Cotton Co., 40 C. C. A. 416, 420, 100 Fed. 373, 377.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 24, Gaming, § 22.]

4. SAME—INTENTION TO SETTLE BY SET-OFF AND RINGING OFF DOES NOT MAKE CONTRACT WAGER NOR AVOID IT.

The settlement of the obligations of such contracts by set-off and by ringing off and by paying the differences according to the rules and prac‑ tice of the Board of Trade of Chicago is not unlawful. The intention of the parties to such contracts to discharge their obligations under them as far as possible by set-off and by ringing off in this way, and to receive or to deliver only that portion of the contracted commodities for which they may be unable to settle in that way, is not illegal, and does not render the contracts or transactions wagers or void. Board of Trade v. Christie Grain & Stock Co., 25 Sup. Ct. 637, 198 U. S. 236, 248, 249, 49 L. Ed. 1031.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 24, Gaming, § 22.]

5. EVIDENCE—PROOF OF WRONG TO AVOID CONTRACTS MUST BE CLEAR—FACTS —CONCLUSION.

The legal presumption is that parties to contracts valid on their faces intend in good faith to perform them. One who would avoid his con‑ tracts and escape their obligations by his own wrong should establish it by clear proof. A speculator dealt in about 14,000,000 bushels of grain, and less than 2 per cent. of it was delivered. He made contracts valid on their faces for the purchase of grain for future delivery through brokers who were members, respectively, of the Board of Trade of Chicago or of the Merchants' Exchange of St. Louis and became indebted to them for balances of account. He testified that he did not intend to deliver or to receive any grain under his contracts unless forced to do so in order to prevent his contracts from being closed out under the rules of the

board or the exchange. *Held*, this evidence did not establish an illegal intention, because it did not disclose a purpose to settle the obligations of his contracts by paying to, or receiving from, the other parties thereto the differences between the contract prices and the market prices at the times of delivery, but it was consonant with an intention to settle the obligations of his contracts as far as possible by set-off and by ringing off and by the payment of differences in accordance with the rules of the board and to deliver and receive that portion of the contracted grain for which he could not thus settle, and this was not an unlawful intention, and did not render the transactions wagers or void.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 20, Evidence, § 84.]

6. INSOLVENCY—EVIDENCE—SUFFICIENCY.

Proof that one had property of the value of only about $50 and that he owed more than $25,000 in July, and that he paid no part of this indebtedness during the succeeding four months, is sufficient evidence that he was insolvent in the following October and December. A condition of insolvency is presumed to continue as long as such conditions usually continue under similar circumstances.

(Syllabus by the Court.)

Appeal from the District Court of the United States for the Eastern District of Missouri.

Chester H. Krum, for appellant.

Richard A. Jones (Nathan Frank and David W. Voyles, on the brief), for appellees.

Before SANBORN and VAN DEVANTER, Circuit Judges, and PHILIPS, District Judge.

SANBORN, Circuit Judge. T. A. Cleage, Jr., was adjudged a bankrupt upon the petitions of W. H. Laidley, Thomas E. Price, and the W. C. Lamping Grain Company, upon the ground that, while insolvent and within four months before the filing of the petition against him, he paid to the C. H. Albers Commission Company, one of his creditors, $3,000, and thereby preferred it. This adjudication is assailed because, as counsel for the defendant insists, he was a speculator in grain, and was not engaged in trading or in mercantile pursuits, because he was not indebted to any of these alleged creditors for the reason that their claims are founded upon transactions with him in the purchase and sale of grain wherein he never intended to deliver or to receive the articles which he bought or sold, but meant to settle his contracts by the payment or the receipt of the differences between the contract prices and the market prices at the times of the performance of the contracts, and because he was not insolvent when he made the payments to the Albers Commission Company. The bankruptcy law of 1898 reads:

"Any natural person, except a wage-earner or a person engaged chiefly in farming or the tillage of the soil, any unincorporated company, and any corporation engaged principally in manufacturing, trading, printing, publishing, or mercantile pursuits, owing debts to the amount of one thousand dollars or over, may be adjudged an involuntary bankrupt upon default or an impartial trial, and shall be subject to the provisions and entitled to the benefits of this act. Private bankers, but not national banks or banks incorporated under state or territorial laws, may be adjudged involuntary bankrupts." 30 Stat. c. 541, § 4b, p. 547, 3 U. S. Comp. St. 1901, p. 3423, § 4b.

The clause "engaged principally in manufacturing, trading, printing, publishing, or mercantile pursuits" is limited in its qualifying effect to the words "any corporation." Any unincorporated company may be adjudged an involuntary bankrupt, although it is not engaged in manufacturing or trading, and is engaged chiefly in farming or in the tillage of the soil, and any natural person who is not a wage-earner or engaged chiefly in farming or the tillage of the soil may be adjudged an involuntary bankrupt, although he is not "engaged principally in manufacturing, trading, printing, publishing, or mercantile pursuits." Cleage was not a wage-earner or a person engaged chiefly in farming or the tillage of the soil, and he was therefore liable to an adjudication as an involuntary bankrupt whether or not he was principally engaged in manufacturing, trading, or any other pursuit. In re Seaboard Fire-Underwriters (D. C.) 137 Fed. 987, 988; In re Taylor, 42 C. C. A. 1, 3, 102 Fed. 728, 730; In re Lake Jackson Sugar Co. (D. C.) 129 Fed. 640, 642; Lovelands' Law & Proceedings in Bankruptcy, p. 142.

The creditors whose claims are challenged were brokers who bought and sold grain for future delivery for the defendant, Cleage, either on the Board of Trade of Chicago or upon the Merchants' Exchange of St. Louis, and their claims are for amounts which they paid for the defendant in excess of the amounts which they received for him in the settlement or performance of contracts which they made or assumed on his behalf, and also for expenses, commissions, and interest. There is no doubt that the defendant owes these balances unless the transactions from which they sprang were illegal and Cleage's contracts were void for the reason that he did not intend to receive the grain he purchased nor to deliver the grain he sold, but to settle his obligations by the payment of differences.

Before entering upon the discussion of this question under the evidence, we lay aside certain purchases and sales of puts and calls, privileges, or options to deliver or to take grain at specified prices which appear in some of the accounts, because the master and the court below eliminated these from the claims allowed and held that such purchases and sales were wagers. The claims of the petitioners and of the Albers Commission Company which were sustained are for balances of moneys expended by the brokers above the amounts they received in the settlement or performance of contracts for the purchase and sale of grain for future delivery, which the brokers had made for the defendant by his direction upon the Board of Trade or the Merchants' Exchange. These contracts were not options, but by their terms complete agreements of both parties, of the one to buy and to take, and of the other to sell and to deliver, the commodity. The only option contained in them was that the seller had the right to select the day in the future month in which the delivery was to be made when that should be done. The transactions of the defendant with these four brokers were, in all respects material to the question to be determined, of the same character. Each of the brokers was a member either of the Chicago Board of Trade or of the Merchants' Exchange of St. Louis, and was governed by its rules which were

known to the defendant. Cleage deposited with the broker a sum of money termed a "margin" to secure the latter against any loss that might be occasioned by the fluctuations of the market price of the commodities in which the defendant dealt. Cleage directed the broker to buy or to sell grain to be delivered in some future month. The broker purchased of, or sold to, another broker as directed by Cleage upon the board or the exchange in accordance with its rules, which forbade dealing in differences on the fluctuations of the market without a bona fide purchase and sale of the article for an actual delivery. The brokers who were parties to these purchases and sales made written contracts in their own names whereby they agreed that one would buy and receive and the other would sell and deliver in the future month specified the grain which the defendant ordered his broker to buy or to sell. These contracts were in writing, were signed by the brokers, and bound them and the defendant, the undisclosed principal who ordered them, unless they were rendered void by the unlawful intent of the defendant. As soon as they were made and as often as any sale or substitution or settlement or modification of any of them was made, the defendant was notified and he ratified them.

The rules of the Board of Trade and of the St. Louis Exchange were such that, where one had bought and had also sold large quantities of grain upon the board or upon the exchange to be delivered in a certain future month, these purchases and sales might be set off against each other so that he would be required to pay the difference in the price of the grain thus set off and to deliver or receive only that portion of the grain which was not thus set off. This was accomplished in two ways, by the direct method and by ringing off. In Board of Trade v. Christie Grain & Stock Co., 198 U. S. 236, 247, 25 Sup. Ct. 637, 49 L. Ed. 1031, Mr. Justice Holmes describes these methods in this way:

"The direct method consists simply in setting off contracts to buy wheat of a certain amount at a certain time against contracts to sell a like amount at the same time, and paying the difference of price in cash at the end of the business day. The ring settlement is reached by a comparison of books among the clerks of the members buying and selling in the pit, and picking out a series of transactions which begins and ends with dealings which can be set off against each other by eliminating those between—as, if A. has sold to B. 5.000 bushels of May wheat, and B. has sold the same amount to C., and C. to D. and D. to A. Substituting D. for B. by novation, A.'s sale can be set off against his purchase, on simply paying the difference in price."

The only effect of the use of these methods is to avoid the useless expense and trouble of the physical delivery of the grain, and still to preserve the legal rights and remedies of the parties. If A. has sold to B. 5,000 bushels of grain at 75 cents per bushel to be delivered on a certain day, and B. has sold to A. the same quantity at 74 cents per bushel to be delivered on the same day, it is evident that the legal, financial, and actual result is the same whether A. delivers the grain to B., B. pays 75 cents per bushel for it to A. and delivers it back to A., who pays to B. 74 cents per bushel for it, or they set off the two contracts and B. pays to A. the difference in price or 1 cent per bushel. In either event, the grain ultimately remains in A.'s posses-

sion, and he gets one cent per bushel from B. and no more. The setting off of the contracts has all the effects of a delivery of the grain. The same thing is true of a ring settlement. This method is more complex, but, if it is followed carefully through, it will be found that the results are the same whether the contracts are all specifically performed by actual delivery of the grain according to the terms of each contract or they are settled by ringing them off. There is a slight difference in the rules of the Board of Trade of Chicago and of the Merchants' Exchange of St. Louis. The rules of the former provide for settlements by ringing off, while the rules of the latter provide a method of accomplishing the same result in a slightly different way. As the difference is immaterial the indirect method of settling will be termed "ringing off" in this opinion.

The defendant was operating through his brokers under these rules, and was trying to run a corner. He bought through his brokers during the years 1902 and 1903 immense quantities of grain for future delivery amounting to about 14,000,000 bushels, and he sold nearly as much as he bought, so that more than 98 per cent. of his contracts were settled by set-offs and by ringing off without any actual delivery of grain. All the transactions which the defendant had with Laidley were disposed of in this way, and there remained a balance of $3,650 due from him to Laidley on account of the payments the latter had made of differences upon contracts thus set off, commissions, expenses, etc., for which he gave to Laidley his promissory note. Through the Lamping Grain Company he bought about 3,000,000 bushels of grain for future delivery. Most of this grain was sold or other grain was sold to offset it, but 50,000 bushels of wheat were delivered to the Lamping Company under the defendant's contracts in July, 1903, for which that company was compelled to pay the contract price, and in July, 1903, there was due to it on account of these transactions $3,922.97. He was also indebted in July, 1903, to the petitioner, Thomas E. Price, in the sum of $18,235.85 on account of similar transactions. In October, 1903, he owed C. H. Albers Commission Company upon a like account a debt of several thousand dollars, and he paid thereon $2,000 in October and $1,000 in December.

Under the rules of the board and of the exchange, when one fails upon the delivery day to take and pay for the grain which he has purchased under a contract which has not been settled by set-off or by ringing off, all his trades are closed up and thrown upon the market. Cleage had no elevator or warehouse, and he testified that he did not intend to receive any of the grain he bought, but intended to settle on differences. On cross-examination he said:

"I expected to have to take some of this corn or wheat, as the case might be, but I would only take that amount that was forced on me in order to keep my trades from being thrown over, as I knew very well that if I failed to take cash wheat or corn that they delivered to me that my contracts would all be closed up and thrown on the market."

Under the common law and under the statutes of Illinois a contract for the sale for future delivery of grain or other commodities, the parties to which intend that the goods shall not be delivered, and that the obligation of the contract shall be discharged by the payment

of one party to it to the other of the difference between the contract price and the market price of the goods at the date fixed for their delivery, is void, because the contract evidences a wager. Irwin v. Williar, 110 U. S. 499, 508, 4 Sup. Ct. 160, 28 L. Ed. 225; Embrey v. Jemison, 131 U. S. 336, 345, 9 Sup. Ct. 776, 33 L. Ed. 172; Bibb v. Allen, 149 U. S. 481, 492, 13 Sup. Ct. 950, 37 L. Ed. 819; Ponder v. Jerome Hill Cotton Co., 40 C. C. A. 416, 419, 100 Fed. 373, 376; Pixley v. Boynton, 79 Ill. 351. And under the statutes and decisions of the state of Missouri such a contract is void if either of the parties to it has such an intention. Rev. St. Mo. 1889, §§ 3837, 3838; Connor v. Black, 132 Mo. 150, 33 S. W. 783; Edwards Brokerage Co. v. Stevenson, 160 Mo. 516, 527, 61 S. W. 617. In this state of the evidence and of the law the master found, and the court below affirmed his finding, that neither the brokers nor the defendant ever had such an intention in the transactions which are the subject of this litigation, and this finding is assigned as error. So far as it concerns the intention of the brokers, it is supported by their testimony and by the fact that they received and paid for several thousand bushels of grain which were delivered to them upon contracts which they had made for the defendant upon his orders. But counsel insist that the testimony of the defendant, the immense quantities of grain which he bought and sold, the small percentage of it actually delivered and the public policy of the nation to suppress wagers establish his illegal purpose, convey notice of it to his brokers, and avoid his obligations to pay them for the money which they advanced on his behalf and the commissions they sought to earn. Let us see. He testified that he did not intend to receive the grain which he bought, but that he intended to take and pay for that portion which was forced upon him for the reason that, if he did not do so, all his contracts would be closed. What is the true signification of this testimony in the light of the rules of the board and of the exchange and of the practice of settlement by set-off and by ringing off, to which attention has been called? It is that he intended to sell so many of his contracts of purchase and so much other grain that all his contracts of purchase would be either sold or discharged by set-off or by ringing off, so that, when the times of delivery came, he would be under no obligation to receive. This was not an unlawful intention, and it did not avoid his obligations under the late decision of the Supreme Court. "Set-off" says Mr. Justice Holmes in Board of Trade v. Christie Grain & Stock Co., 198 U. S. 236, at page 248, 25 Sup. Ct. 637, at page 639 (49 L. Ed. 1031), "has all the effects of delivery. The ring settlement is simply a more complex case of the same kind. These settlements would be frequent, as the number of persons buying and selling was comparatively small. The fact that contracts are satisfied in this way by set-off and the payment of differences detracts in no degree from the good faith of the parties, and, if the parties know when they make such contracts that they are very likely to have a chance to satisfy them in that way and intend to make use of it, that fact is perfectly consistent with a serious business purpose and an intent that the contract shall mean what it says. There is no doubt, from the rules of the Board of Trade or the evidence, that the contracts made between

the members are intended and supposed to be binding in manner and form as they are made. There is no doubt that a large part of those contracts is made for serious business purposes. 'Hedging,' for instance, as it is called, is a means by which collectors and exporters of grain or other products, and manufacturers who make contracts in advance for the sale of their goods, secure themselves against fluctuations of the market by counter contracts for the purchase or sale, as the case may be, of an equal quantity of the product, or of the material of manufacture. It is none the less a serious business contract for a legitimate and useful purpose that it may be offset before the time of delivery in case delivery should not be needed or desired."

In other words, contracts for future delivery made with the intention of settling them by paying to the other parties to the contracts the difference between the contract prices and the market prices at the times of delivery are wagers and are void. But contracts for future delivery made with the intention of settling them by set-off or by ringing off and by the payment of differences in accordance with the rules and practice of the Board of Trade are valid and enforceable agreements under this decision.

Nor does the fact that the defendant dealt in 14,000,000 bushels of grain, and that the contracts for more than 98 per cent. of this property were settled by set-off or by ringing off and by the payment of differences, demonstrate an illegal intention. Since the intention to settle in this way is not unlawful, the fact that contracts were so settled cannot evidence an illegal purpose. "In the view which we take," says the Supreme Court, "the proportion of the dealings in the pit which are settled in this way throws no light on the question of the proportion of serious dealings for legitimate business purposes to those which fairly can be classed as wagers or pretended contracts. No more does the fact that the contracts thus disposed of call for many times the total receipts of grain in Chicago. The fact that they can be and are set off sufficiently explains the possibility, which is no more wonderful than the enormous disproportion between the currency of the country and contracts for the payment of money, many of which in like manner are set off in clearing houses without any one dreaming that they are not paid, and for the rest of which the same money suffices in succession; the less being needed the more rapid the circulation is." Board of Trade v. Christie Grain & Stock Co., 198 U. S. 236, 250, 25 Sup. Ct. 637, 49 L. Ed. 1031.

It is the public policy of the United States to suppress wagers, but it is also its policy to enforce the obligations of valid contracts, and one who would avoid his agreements and escape his obligations by his own wrong should be required to establish it by clear and convincing proof. Contracts for the future delivery of grain and other personal property are lawful and valid. The legal presumption is that the parties who make them intend to perform them, and the burden is on him who avers that the illegal intention of one or more of these parties has made them void to establish his allegation by plenary proof. Clews v. Jamieson, 182 U. S. 461, 489, 21 Sup. Ct. 845, 45 L. Ed. 1183; Pixley v. Boynton, 79 Ill. 351. An intention by one or both of the parties to sell such an agreement, or their rights

under it, before the time of delivery, does not avoid it. Parties have the same right to buy contracts for the future delivery of personal property with the intention of selling them that they have to buy the property with such an intention. Ponder v. Jerome Hill Cotton Co., 40 C. C. A. 416, 420, 100 Fed. 373, 377. An intention to discharge a contract for the future delivery of personal property by set-off or by ringing off under the rules and practice of the Board of Trade and by the payment of differences is not illegal, and does not render the agreement void. The contracts which form the foundation of the claims of the brokers which are here in question were made and ratified by the defendant. They were legal contracts per se. There was no evidence that either the defendant or the brokers intended to settle them without the delivery of any grain by the payment to, or receipt from the other parties to the agreements of the difference between the contract prices and the market prices at the times of performance. The intention not to receive grain unless forced to do so to protect his contracts to which the defendant testified is consonant with the lawful intention to sell like quantities of grain and to settle his obligations as far as possible by set-offs and by the use of rings, so that he would be obligated to receive but little or none of the commodities. From the lawful contracts the legal presumption arose that the parties thereto intended in good faith to perform them. It was the opinion of the master and of the court below that this presumption was not overcome by the evidence. Their opinion raises a strong presumption in support of this conclusion. Where the court below and its master have considered a question and made a finding on conflicting evidence, their conclusion is presumptively correct, and it ought not to be disturbed unless an obvious error has intervened in the application of the law or some serious mistake has been made in the consideration of the facts. Tilghman v. Proctor, 125 U. S. 136, 8 Sup. Ct. 894, 31 L. Ed. 664; Kimberly v. Arms, 129 U. S. 512, 9 Sup. Ct. 355, 32 L. Ed. 764; Stearns-Roger Mfg. Co. v. Brown, 52 C. C. A. 559, 563, 114 Fed. 939, 943; Dodge v. Norlin, 66 C. C. A. 425, 433, 133 Fed. 363, 371. A careful review of the evidence in this case and a thoughtful consideration of the law applicable to it has failed to convince that there was any mistake in the finding of the master and of the court below that neither the defendant nor the brokers had any illegal intent in the making or in the performing of the contracts upon which the claims of these brokers rest. Our conclusion is that they constitute just obligations of the defendant, and that the payment of the $3,000 to the Albers Commission Company wrought a voidable preference, and was an act of bankruptcy.

In reaching this conclusion the claim of counsel for the defendant that there was no competent evidence of insolvency has not been overlooked. It is true that there was no evidence of the amount of the assets of the defendant at the times when the payments were made to the Albers Commission Company in October and November, 1903. But it is also true that the defendant admitted in July of that year that he was "broke," and that he had no property except the furniture in his offices, which was not worth more than $50. There was uncontradicted evidence that he owed the petitioners more than $25,000, and that

149 F.—23

he had never paid any part of these debts. It may be that a state of insolvency once proved is not presumed to continue forever, but it is presumed to continue as long as such a state of affairs usually continues under similar circumstances. A man who has property of the value of only $50 and who owes over $25,000 in July, which he does not pay, does not usually accumulate assets worth more than $25,000 by the next December, and there was no mistake in the finding of the court that the defendant's poverty in July had not turned into wealth in December.

The findings of the master and of the court are sustained by the evidence, the facts warrant the adjudication, and the decree below is affirmed.