## SAWERS GRAIN COMPANY *v.* TEAGARDEN, RECEIVER, ETC.

[No. 12,295.    Filed June 12, 1925.    Rehearing denied January 5, 1926.    Transfer denied May 11, 1926.]

1. GAMING.—*"Bucket shop" defined.*—Section 2961 Burns 1926, §3837 Burns 1914, defines a "bucket shop" as any office, store, or other place, where the proprietor, in his own behalf, or as an agent, makes, or offers to make, contracts, trades or transactions for the purchase or sale of any commodity wherein the parties thereto do not contemplate the actual or *bona fide* receipt or delivery of such property, but do contemplate a settlement thereof based on differences in the price at which said property is, or is claimed to be, bought and sold.    p. 530.

2. GAMING.—*Finding that member of board of trade and grain dealer did not intend an actual transfer or delivery of the property bought or sold, but intended speculation only, held sustained by the evidence.*—In an action by a grain broker to recover the amount claimed to be due it as commissions for the purchase and sale of grain, a finding that neither party to the transaction intended an actual transfer or delivery of the property bought or sold, but intended only to speculate on the board of trade in future prices, and to make settlement, at stated times, by paying the difference between the contract and the market prices, was *held* sustained by the evidence.    p. 537.

3. GAMING.—*Transactions between member of board of trade and grain dealer in reality speculations in future prices of grain without intent to deliver were illegal and void.*—Transactions between a grain dealer and a member of the Chicago Board of Trade purporting to be the purchase and sale of grain, but in which there was no intention of either party that there should be any actual transfer or delivery of the grain bought or sold, but they intended only to speculate on said board of trade in the future prices of grain, and to make periodic settlements of the losses or gains by paying in cash the difference between the contract price and the market price, were illegal and void under §§2691, 2692 Burns 1926, §§3837, 3838 Burns 1914.    p. 537.

Sawers Grain. Co. *v.* Teagarden, Rec.—84 Ind. App. 522.

4. PAYMENT.—*Broker not entitled to credit proceeds of actual sale of commodities on losses by his client in dealings in "futures".*—A broker on the Chicago Board of Trade which carried two separate accounts with an Indiana grain-dealer, one for actual sales of grain and one for dealing in "futures" and options, *held* not entitled to credit proceeds from actual sales of grain for the grain-dealer to indebtedness for losses in the "futures" account, and thereby merge its valid indebtedness into the invalid claim against the grain-dealer. p. 538.

5. PAYMENT.—*Holder of invalid claim against another cannot validate same by crediting valid debt thereon.*—The holder of an invalid and illegal claim against another cannot, without the consent of the debtor, credit on the same a valid debt which he owes his *bona fide* creditor, and thereby merge his valid indebtedness into his invalid claim. p. 538.

6. GAMING.—*Broker not entitled to recover payments to customer as "winnings" from dealings in "futures" and options in another state.*—Under §§2691, 2692 Burns 1926, §§3837, 3838 Burns 1914, making transactions in "futures" and options illegal and void, a broker is not entitled to recover payments made to customers as "winnings" in such transactions, regardless of the law of the state in which the transactions were carried on. p. 539.

7. CORPORATIONS.—*Manager of corporation cannot be authorized by directors to conduct transactions illegal and void if conducted by the directors.*—Where transactions conducted by the manager of a corporation were illegal and void, it was immaterial whether he acted by authority of the board of directors or not when the same transactions by the board would be illegal and void. p. 540.

8. CORPORATIONS.—*Authorization of manager of grain elevator to "hedge" grain bought as he deemed it necessary would not authorize his speculating in "futures."*—A direction to the manager by the board of directors of a corporation operating a grain elevator to "hedge" grain bought as he deemed it necessary would not authorize him to speculate in "futures" and options on the board of trade to the extent of 3,800,000 bushels in three years, in addition to the grain actually passing through the elevator, the capacity of which was only 280,000 bushels a year. p. 540.

From Benton Circuit Court; *Burton B. Berry,* Judge.

Action by the Sawers Grain Company against Charles Teagarden, receiver of the Raub Grain Company and

another. From a judgment for defendant named, the plaintiff appeals. *Affirmed.* By the second division.

*William Darroch, Fraser & Isham* and *J. Arthur Miller,* for appellant.

*Edmon G. Hall, C. V. McAdams* and *Harry P. Schultz,* for appellee.

NICHOLS, J.—Appellant filed a claim against appellee as receiver of the Raub Grain Company, the same being based upon an account stated, claiming balance due thereon in the sum of $38,751.06, such account being accompanied by two notes of the Raub company to appellant, each in the sum of $10,000. These two notes represented part of the said sum of $38,751.06, the amount of the same having been charged back for nonpayment according to the custom of merchants. There was no formal complaint other than the account and the notes. Appellee answered in denial; *non est factum* to the notes; want of consideration; payment; and that the Raub company had employed one Kelley as manager, that appellant was engaged in the purchase of grain options or futures, that before the accruing of the account and the making of the notes, said Kelley, pretending to act for the Raub company, unlawfully and wrongfully entered into contracts with appellant to buy and sell, on the Chicago Board of Trade, options or futures in various kinds of grain in various quantities, that the manager made such purchases and sales in the name of the Raub company, and agreed to pay a commission and all losses sustained, some of which losses he did, from time to time, pay, that it was agreed between appellant and appellee (Raub company) that no grain sold was to be delivered by either party, but that the several contracts were to be settled by the payment of gains or losses, as the case might be, that all of said

transactions were so closed by appellant, and that the sole consideration for the notes was in settlement, in part, of these transactions, none of which appeared on the books of the Raub company. There was a sixth paragraph, which was, in fact, a cross-complaint, accompanied by an exhibit to which it refers, in which cross-complaint, it was claimed that appellant had received from the Raub company corn and oats to the amount of $8,833.76, which sum was due and owing. Appellee also filed a cross-complaint asking the cancellation of the notes, alleging that its manager made gains and losses in its name and for its account, and that appellee took, accepted, paid and accounted for losses in speculation made by its manager in grain futures, and that the notes sued on were given by its manager in settlement of these speculative accounts and praying that the notes be canceled and declared void. There was an affirmative reply to the affirmative answers and an answer to appellee's cross-complaint; also appellant's cross-complaint to appellee's cross-complaint. As the pleadings are not challenged, we do not need to set them out. There was a special finding of facts upon which the court stated its conclusions of law in favor of appellee, upon which judgment was rendered.

While this cause was pending in the Supreme Court, Josiah L. Portteus was substituted as receiver of the Raub Grain Company, and, as such, appellee herein.

The questions presented in this court are the alleged error of the court in each of its conclusions of law, and in overruling appellant's motion for a new trial. Appellee makes divers objections to appellant's briefs, but, as there appears to be a good faith effort to present the questions involved, and appellant has made its points reasonably clear, and further, as appellee has assured us in his application for extension of time for briefing,

that his brief would be upon the merits, we give these objections no further consideration.

It appears by the special finding of facts, which covers twenty-six pages of appellant's brief, that appellant for many years has been a corporation with its principal place of business in Chicago, Illinois, and engaged in the purchase of grain in car-load lots for cash from its customers throughout the middle west grain territory, during and long before the time covered by the issues in this case.

There has been during said time an organization in Chicago, Illinois, known as "the Chicago Board of Trade." Appellant's president and secretary have each been members of such board of trade and had seats in its exchanges, and have been entitled, as such members, to transact business on its floor. During all of the time covered by the issues herein and for many years prior thereto, such board of trade has operated and maintained in said place of business various grain pits wherein its members could and did daily buy and sell options or futures on the prices of all kinds of grain. Appellant was so engaged in buying and selling options and futures, which constituted a large part of its business. The Raub company had its principal place of business at Raub, Benton county, Indiana. It had a capital stock of $15,000, owned by farmers and retired farmers in the community. Its business was to buy grain and to store, ship and sell the same. For that purpose, it owned a grain elevator at Raub, the capacity of which was 70,000 bushels, which could ordinarily be turned over about four times annually, thereby handling about 280,000 bushels of grain each year. When the company commenced business in 1915, it employed Lee Kelley as its manager, in which employment he continued until July 1, 1920, when he abandoned the employment without notice. On February 9, 1916, there

were 30,000 bushels of oats in the elevator, and when said Kelley left in 1920, there were 29,750 bushels of oats and 6,132 bushels of corn. The amount of grain in the elevator at other dates does not appear by the evidence. The Raub company was conducted largely on borrowed capital, and, at the time said Kelley left, had borrowed about $30,000 and was using an additional sum of $50,000 furnished by stockholders at that time, the receiver was appointed, who has since been acting as such and is appellee herein. The Raub company is insolvent, and was indebted at the time of trial, in addition to appellant's claim sued on, in the sum of $31,934.80, to which must be added expenses of the receivership. Its assets were then $24,197.21 excluding appellee's set-off hereinafter mentioned. From time to time during the years from 1915 to 1920, inclusive, the Raub company sold to appellant grain for cash on delivery, which was accepted by appellant, and it paid a part of the purchase money therefor but nothing after November 3, 1919. When the claim herein was filed, the receiver filed his set-off for money unpaid for grain delivered to appellant, in the sum of $8,833.76, of which amount $845.81 had been credited by appellant on its books and applied on the "futures" account with said Raub company. No part of the $8,833.76 has been paid. On February 9, 1916, when, as aforesaid, the Raub company had about 30,000 bushels of oats in its elevator, car equipment was scarce and could not be procured at all times in quantities desired. The directors of the Raub company then directed said manager to sell half of the oats on the Chicago Board of Trade for the purpose of "hedging" the company against loss on account of the fall in price of such grain during the time it was held in the elevator. The minutes of such order were made by the manager, and the secretary's name

signed thereto by the manager, and were not read at any subsequent meeting of the board. They were as follows: "It was moved and seconded that the manager be given authority to hedge grain bought as he deemed it necessary. The motion was carried."

This order as recorded is different from the one which the board made. Said Kelley, pursuant to said order as entered, sold a quantity of the oats in the year 1916, which resulted in a loss to the company. In June, 1917, Kelley commenced operations in buying and selling options or futures on the price of grain on the Chicago Board of Trade which continued from that day until June, 1920, when Kelley abandoned his employment. These operations, conducted at divers times during the years 1917 to 1920, inclusive, resulted in total net losses of $46,229.88, including appellant's commissions, in the total sum of $8,831.91, to which should be added some smaller items of loss which we do not need to mention. During all of these operations, the parties thereto, or any of them, did not intend to purchase and receive, or to sell and deliver, the various and divers quantities of grains or any of them represented and comprehended by said several deals, nor did they intend to pay for any of the grains so sold, but intended only to speculate on said Chicago Board of Trade in the "futures" prices of grain, and, in fact, no grain was delivered on account of any such deals or transactions. Said Kelley, during such time, purchased other options or "futures," but they were all speculative and were conducted without any purpose on the part of the Raub company, or its manager, to accept and receive the grain purchased or to deliver the grain sold, and these other operations resulted in a loss of $1,175.29, which sum was charged against the Raub company. Another operation resulted in a gain of $1,967.36 which sum was credited to the Raub company on its "futures" account. The Raub

company drew drafts on appellant for cash grain sold to it in the total sum of $7,450, which were charged to it in its account for grain sold, there being a balance in that account of $8,833.76. Such Raub company, acting through its said manager, also drew sight drafts at divers times on appellant in the total sum of $11,500 for profits reported to it on account of the dealings in options and "futures," and these drafts were charged to its "futures account." Said Kelley also issued checks at divers times, when there were losses, upon the banking account of the Raub company in the total sum of $10,000, which were credited to its "futures account" by appellant. Because of the losses aforesaid, appellant demanded payment thereof from said Kelley, acting as manager as aforesaid, who thereupon executed the two notes filed as part of the claim with the receiver. The only consideration for these notes was the losses sustained in such dealings in options and "futures" in the price of grain on the Chicago Board of Trade by appellant for and on behalf of said Raub company, such dealings being at the request and direction of said Kelley. When appellant received the notes, they were credited to the Raub company "futures account," but subsequently, and before it filed its claim, and because of their nonpayment, such notes were charged back to the company on its "futures account" and represent part of the $47,584.82 hereinafter mentioned. The Raub company had no notice or knowledge that appellant claimed it was indebted to appellant, or that such notes had been executed, until long after Kelley left its employment. It gave no authority to Kelley to deal in options or "futures," except as to the oats in the bin in 1916, or to execute said notes. Kelley did not enter in the books of the Raub company any of transactions or dealings in options or "futures," or the said

notes, except one entry which was not indexed and not discovered by the company, and when the Raub company employed an accountant to audit its books, Kelley departed to parts unknown. The Raub company never authorized Kelley to sell and deliver to appellant grain owned by it and to apply the proceeds on mergers, "futures" or losses connected with or growing out of the dealings in options and "futures" on the price of grain. Appellant kept at its office, during all of the time here involved, two separate departments on the same floor. In one of these departments the business of "futures" was conducted and the accounts thereof kept, and in the other of such departments, the business of handling cash and commissions grain was conducted, and the accounts thereof kept. The first of such accounts was designated "FUTURES ACCOUNT," and the second "RECEIVING ACCOUNT." The Raub company conducted a cash grain business with appellant long before the option and "futures" account was opened, and its cash grain sold to appellant was entered in the receiving account, except items aggregating $845.81 of cash for grain received from its Indianapolis office, which items were credited to the "futures account." At that time, the "futures account" showed a large sum due appellant, upon which Kelley had ceased to make any payments. The two accounts were kept separate by appellant, until long after Kelley abandoned his employment as aforesaid, and so remained until appellant was preparing to file its claim herein, when such accounts were merged upon its ledgers.

By the act of April 10, 1907, Acts 1907 p. 488, §2691 Burns 1926, §3837 Burns 1914, a bucket shop is defined to be "* * * any office, store or other place

1. where the keeper or proprietor thereof, either in his or its own behalf, or as an agent * * *, makes or offers to make with others contracts, trades

or transactions for the purchase or sale of any such commodity (grain), wherein the parties thereto do not contemplate the actual or bona fide receipt or delivery of such property, but do contemplate a settlement thereof based upon the differences in the price at which said property is, or is claimed to be, bought and sold." Section 2 of such act, being §2692 Burns 1926, §3838 Burns 1914, makes it unlawful for any corporation or person to keep or cause to be kept any such bucket shop, and provides a penalty for the violation of the law. But, long before the passage of this act, the question here involved was definitely determined by our Supreme Court in the case of *Whitesides* v. *Hunt* (1884), 97 Ind. 191. The court, speaking with reference to such transactions, says: "In the case of *Rumsey* v. *Berry, supra,* the court very clearly defines the line which separates the two classes of contracts, the legal from the illegal. In that case, it was said: 'A contract for the sale or purchase of wheat to be delivered in good faith at a future time is one thing, and is not inconsistent with the law. But such a contract entered into without an intention of having any wheat pass from one party to the other, but with an understanding that, at the appointed time, the purchaser is merely to receive or pay the difference between the contract and the market price, is another thing, and such as the law will not sustain. This is what is called a settling of the differences, and as such is clearly and only a betting upon the price of wheat, against public policy, and not only void, but deserving of the severest censure.'" Other authorities to the same effect are cited and discussed.

The action in the Whitesides case was by commission merchants to recover commissions and money advanced to the purchaser of wheat through the Chicago Board of Trade, and there was a verdict in favor of the plaintiff, upon which judgment was rendered, and the Su-

preme Court, holding that while honest trade and commerce in a legitimate way in all commodities should be rigidly upheld as the great lever of individual and national prosperity, fictitious, illegitimate and illegal trading, not based upon values paid out and received, should be discouraged and prevented in every legitimate way possible, found that there was some evidence tending to show that the intention not to deliver the wheat at the maturity of the contract was not mutual, and that the intention was a question to be decided by the jury, and when their decision had been approved by the court who heard all of the evidence in refusing to grant a new trial, it mattered not what the Supreme Court then might think of the merits of the weight of the evidence, and, following the well-established rule in such cases, refused to interfere with the verdict of the jury.

In the case of *Sondheim* v. *Gilbert* (1888), 117 Ind. 71, 18 N. E. 687, 5 L. R. A. 432, 10 Am. St. 23, the action was upon a note executed solely for the purpose of paying or securing losses or margins which were required to be put up in contemplated transactions which were to be merely gambling or wagering speculations in cotton futures. There was an answer filed to that effect, and the court, citing *Irwin* v. *Williar* (1883), 110 U. S. 499, 4 Sup. Ct. 160, 28 L. Ed. 225, said that: "While contracts for the sale of property to be delivered in the future are valid, where the parties, or either one of them, actually contemplated a delivery of the subject-matter of the contract, yet if, under the guise of a contract which has the appearance of validity upon its face, the real intention is merely to speculate upon the rise or fall of the market, without any purpose that any property shall be delivered or received, but with the understanding that, at the appointed time, the act is to be adjusted by paying or receiving the difference between the contract and the current price, then the whole

Sawers Grain Co. *v.* Teagarden, Rec.—84 Ind. App. 522.

contract is illegal, as against public policy, and falls under the condemnation of the law." It was there held that, as between the parties to such a transaction, and all other who participated in the specific illegal design, any contract or other security resulting therefrom will be wholly invalid, but the note sued on was commercial paper in the hands of an innocent holder for value, and it was held that there could be a recovery under such circumstances.

In *Pearce* v. *Dill* (1897), 149 Ind. 136, 48 N. E. 788, appellant was operating a bucket shop, and the action by appellee was against him to recover certain funds which had been unlawfully diverted by her agent, and placed to his account in gaming and wagering upon the market price of wheat, corn, oats and other products; and the court held that the evidence fully proved that appellant was operating what was commonly known as a "bucket shop," and was conducting the illegal business of selling "futures" or options; that the product which he intended to sell to his customers he did not have at the time, and that it was mutually understood and intended by both parties that grain which was claimed to be sold and purchased was not to be delivered, but when the time fixed for its delivery arrived, the market value at Chicago of such cereals should constitute the basis upon which settlements should be made; that as the market price would rise and fall, there would be loss or gain to the purchaser; that such deals or transactions were understood to be a speculation solely on chances, and were in contravention of and hostile to public policy, and therefore illegal, and the judgment restoring to the appellee her funds so misappropriated was affirmed.

In the case of *Western Union Tel. Co.* v. *State, ex rel.* (1905), 165 Ind. 492, 76 N. E. 100, 3 L. R. A. (N. S.) 153, 6 Ann. Cas. 880, the action was for a mandate to

compel appellant, as a public service corporation, to sell and deliver to appellees' relator the continuous market quotations of the Chicago Board of Trade. Appellant made return to the alternative writ of mandate by its third, fourth, and fifth paragraphs of answer to the effect that the relator, the Hammond Elevator Company, was operating a bucket shop, and was using and proposing to use the quotations which it demanded that appellant should furnish, in the conduct of such business. The lower court sustained a demurrer to each of the paragraphs of answer, but the Supreme Court, in reversing the judgment of the lower court for this error, said: "We have no statute denouncing option gambling as a crime, but contracts for the purpose of purchase and sale of commodities, not to be delivered, but only to be performed by advancing and paying differences are void at common law, in the absence of statute" (citing authorities). The court further says: "This court has denounced such practices in the strongest terms," and, quoting from *Pearce* v. *Dill, supra,* says: "The business or operations of the 'bucket-shop' have been the source of much evil. Embezzlement and other crimes on the part of public officers, and bank officials, having the custody of money belonging to others, have been in the past some of the evil fruits directly traceable to dealing in futures in these institutions; and the question of prohibiting such transactions or business, as it is generally conducted, merits the consideration of the legislature."

It is to be observed that this decision was rendered before the enactment of the statute quoted above and that such statute was enacted by the next legislature thereafter. Other authorities to the same effect are: *Davis* v. *Davis* (1889), 119 Ind. 511, 21 N. E. 1112; *Plank* v. *Jackson* (1891), 128 Ind. 424, 26 N. E. 568,

27 N. E. 1117; *Nave* v. *Wilson* (1894), 12 Ind. App. 38, 38 N. E. 876.

By these authorities, it is apparent that, in Indiana, it is the law that while a contract for the sale of property to be delivered in the future is valid, yet parties cannot, under the guise of a contract which has the appearance of validity, make a valid contract where the real intention is merely to speculate upon the rise or fall of the market without any purpose that any property shall be delivered or received, but with the nderstanding that, at the appointed time, the act is to be adjusted by paying or receiving the difference between the contract and the current price. In such guise, such a contract is against public policy, and illegal. This principle, which is of controlling force in this case, is announced in the cases cited by appellant.

In *Gettys* v. *Newburger* (1921), 272 Fed. 209, on page 219, cited by appellant, the court says: "It was indispensable to the existence of substantial evidence that any of the contracts was a wager that competent evidence should be introduced that not only the party on one side, but the parties on both sides thereof, had the pernicious intention which constitutes the contracts wagers and that the plaintiffs, the brokers, either participated therein or were aware of that intention." The same authority, on page 217, quotes from *Irwin* v. *Williar, supra,* as follows: "If, however, at the time of entering into a contract for a sale of personal property for future delivery it be contemplated by both parties that at the time fixed for delivery the purchaser shall merely receive or pay the difference between the contract and the market price, the transaction is a wager, and nothing more," and adds that, to this definition of the vice which renders such a contract a wagering one, that court has since adhered, further saying that it has

been often correctly said in the discussion of the question by courts and counsel that if the parties, at the time the contract is made, had the intention: First, to discharge their obligations under the contract by the payment of the difference between the contract price and the market price at the time fixed in the contract for its performance; and, second, if they also have the intention not to deliver, receive, or pay for the commodity at the time fixed for its delivery in the agreement—the contract is a wager and illegal. But the only intention indispensable to the existence of the wager is the first one. If that intention exists at the time the contract is made, it is a wagering contract whether the second intention exists or not, because there is no way consistent with the laws and the public policy against wagers that the first intention can exist at the time the contract is made without a violation of the law and public policy against wagers. The authority recognizes that there are lawful, customary, and generally prevailing methods growing out of such contracts of settling them and discharging the obligations of the parties thereunder which do not render such contracts wagering contracts or illegal.

The case of Lamson Bros. & Co. v. Turner (1921), 277 Fed. 680, cited by appellant, was decided by the court upon the theory that but one conclusion could be drawn from the evidence, which was that there was no proof of intention of the bankrupt at the time it entered into the contract involved not to accept or make delivery or merely to make settlement of the differences in prices, the court further holding that, even if the intention were such as was asserted, there is no evidence that the plaintiff was aware of such intention or that it did not intend to make or accept delivery, and, therefore, the claim of the trustee that contracts were gambling contracts could not be sustained because

of the illegality of mutual intention to make wagering transactions.

In the case of *Cleage* v. *Laidley* (1906), 149 Fed. 346, 350, cited by appellant, the same rule as above mentioned is recognized in the following language: "Under the common law and under the statutes of Illinois a contract for the sale for future delivery of grain or other commodities, the parties to which intend that the goods shall not be delivered, and that the obligation of the contract shall be discharged by the payment of one party to it to the other of the difference between the contract price and the market price of the goods at the date fixed for their delivery, is void, because the contract evidences a wager."

As appears above, the court in its special finding of facts expressly found that during the time of the deals in options or "futures" here involved, neither the Raub company nor its manager, nor appellant, nor the parties to whom such "futures" were sold, nor from whom the same were purchased, nor any of them, intended to purchase and receive or to sell and deliver the various quantities of grains, or any of them, represented and comprehended by said several deals, nor did they intend to pay for any of the grains so purchased, nor to receive and pay for any of the grains so sold, but intended only to speculate on said Chicago Board of Trade in the future prices of grain, and adjust between appellant and the Raub company, through its manager and through the brokers on such board of trade to whom the same would be sold, or from whom the same was purchased, the difference in cash between the loss and gains accruing on account of such respective purchases and sales; and that no grain was delivered to said Raub company or delivered by it on account of any of such deals or transactions. It is apparent from this finding of the court, and the

same is supported by evidence, in the light of the foregoing authorities, that the transactions between appellant and the Raub Grain Company, so far as they involved dealings in "futures" and options, were illegal, and, being against public policy, void.

We have said that the transactions between appellant and the Raub company are void so far as they involved their dealings in options and "futures";

4, 5. but it does not follow from this that their transactions were void in so far as they involve actual dealings in grain, the delivery and the acceptance of the same, and the obligation to pay therefor. It appears by the findings that appellant recognized the two classes of transactions, the one dealing in cash grain and the other in options and "futures," and so recognizing them, kept two separate accounts, the one involving actual transactions in grain and the other fictitious transactions involving only "futures" and options. It appears by the special finding that the Raub company never authorized its manager to sell its grain to appellant and to apply the proceeds of such sale on the loss in the "futures account." The losses on the "futures account" being invalid and an unauthorized debt, appellant was without authority to apply the proceeds of bona fide sales to the discharge of such losses. It is the law that in adjusting accounts, the holder of an invalid and illegal claim cannot, without consent, credit on the same a valid debt which he owes his bona fide creditor, and thereby merge his valid indebtedness into his invalid claim. Phillips v. Moses (1875), 65 Me. 70; Rohan v. Hanson (1853), 65 Mass. (11 Cush.) 44; Kidder v. Norris (1847), 18 N. H. 532; Bancroft v. Dumas (1849), 21 Vt. 456; Greene v. Tyler & Co. (1861), 39 Pa. St. 361, on page 368; 21 R. C. L., Payment, §98. The said sum of $8,833.76 being the balance due the Raub company upon a valid account,

appellant had no right to apply the same to the payment of the invalid claim, and appellee was entitled by his cross-complaint to recover same.

Appellant contends that it has a right to recover under the averments of its cross-complaint, and by way of set-off, the sum of $11,500, found by the court to have been paid to the Raub company as gains, under §132 of an act of the Illinois legislature, (Laws of 1913 p. 256) which section provides, in substance, that any person losing at gaming or wagering shall be at liberty to sue for and recover from the winner the moneys or other valuables so lost and paid or delivered, or any part thereof, or the full value of the same, by an action of debt. But the latter part of that section expressly excepts from its operation transactions on any regular board of trade in the following language:

"No person who accepts from another person for transmission, and transmits, either in his own name, or in the name of such other person, any order for any transaction to be made upon, or who executes any order given to him by another person on, any regular board of trade or commercial or stock exchange, shall, under any circumstances, be deemed a 'winner' of any moneys lost by such other person in or through any such transaction."

Section 130 of the above mentioned act is as decisive as the Indiana statute (§§2691, 2692 Burns 1926, §§3837, 3838 Burns 1914) in making transactions such as here involved illegal, and, as such, void, but were the law otherwise in the State of Illinois, or were it the law in that state that there was a right of recovery by the loser from the winner of the profits in such transactions, still such transactions entered into in that state could not be enforced in this state, for it would be in direct violation of a positive legislative enactment, which is declarative of the public

policy of this state.  *Vandalia R. Co.* v. *Kelley* (1918),
187 Ind. 323, 326, 119 N. E. 257.

It is well settled in this state that where loss has
been sustained as a result of illegal dealings in futures
and options on the board of trade, the amount thereof
cannot be recovered.  *Lancaster* v. *McKinley* (1903),
33 Ind. App. 448.

Appellant contends that the manager acted with the
full knowledge and authority of the board of directors
of the Raub company, and that the company is
7.  therefore bound by his acts.  The court, how-
ever, has found that the manager had no such
authority as he undertook to exercise and that appellee
obtained knowledge thereof only after the manager had
absconded.  But, as it seems to us, it can make but lit-
tle difference whether the manager acted by the author-
ity of the board of directors or not in the conduct of
the transactions here involved, for such transactions
were illegal and void.  Even though such acts had been
the deliberate direct acts of the board of directors, there
could be no recovery for the transactions were illegal,
against public policy and void.

Even if, as contended by appellant, the board of di-
rectors of the Raub company were bound by the minutes
of the board of directors in this finding above
8.  set out, still there is nothing therein that would
have authorized the transactions here involved
even though they were legal transactions.  The minutes,
as made, simply authorized the manager to "hedge grain
bought as he deemed it necessary."  "Hedging" is de-
fined in *Cleage* v. *Laidley, supra* (quoting and adopting
the definition in *Board of Trade* v. *Christie Grain &
Stock Co.* [1905] 198 U. S. 236, 25 Sup. Ct. 637, 49
L. Ed. 1031), to be "a means by which collectors and
exporters of grain or other products, and manufacturers
who make contracts in advance for the sale of their

goods, secure themselves against fluctuations of the market by counter contracts for the purchase or sale, as the case may be, of an equal quantity of the product, or of the material of manufacture." At the time the aforesaid minutes were made, there were but 30,000 bushels of grain in the elevator. This was in February, 1916. The capacity of this elevator, as appears by the finding, was 70,000 bushels, which, turned four times in the year, gave an annual capacity of 280,000 bushels, but it appears by the finding as well as by the evidence that the manager of the Raub company bought and sold 3,800,000 bushels from June, 1917, to July, 1920, in addition to the grain actually passing through its elevator. It can hardly be contended that transactions involving such an enormous amount of grain were nothing more than "hedging" for the protection of the company in handling grain through an elevator of but 70,000 bushels capacity. The court reasonably inferred that there was no intention to make delivery of the grain bought and sold. The court found that the transactions were speculative, that they were simply wagers in "futures" and options, and that there was no intention at the time of such transactions that there should be any delivery of the grain bought or sold. The evidence fully sustains the finding of the court. There was no error in any of the conclusions of law, and the court did not err in overruling the motion for a new trial.

The judgment is affirmed.